## AMERICAN LAUNDRY MACHINERY INDUSTRIES
### *v.* TIMOTHY EDWARD HORAN ET AL.

[No. 757, September Term, 1979.]

*Decided March 5, 1980.*

98

The cause was argued before MOYLAN, MOORE and WILNER, JJ.

*Donald C. Allen,* with whom were *Allen, Thieblot & Alexander* on the brief, for appellant.

*Max R. Israelson,* with whom were *Samuel O. Jackson, Jr.,* and *Israelson & Jackson, P.A.* on the brief, for appellee Horan. *George L. Russell, Jr.,* for appellee Jessop. Submitted on brief by *Alva P. Weaver, III,* for appellee Sinai Hospital of Baltimore, Inc., and by *James M. Gabler* for appellee Up-to-Date Laundry, Inc.

WILNER, J., delivered the opinion of the Court.

This is a "products liability" case; it is a most unusual one, and also a most tragic one.

Timothy Horan was a balloonist — the "up, up, and away" kind. He owned a large hot air balloon that, for fun and profit, he used in various promotional events.

In October, 1976, Mr. Horan was engaged to fly his balloon in order to advertise or promote the Shrine Circus. The person representing the Circus in this was one William Stair, who also happened to own the Up-to-Date Laundry. As an inducement to Mr. Horan, Mr. Stair promised to clean the balloon if it got dirty, which, indeed, it did. Unfortunately, however, Mr. Stair's laundry did not have a machine large enough to handle the balloon. It should be explained at this point that the actual balloon part (*sans* cable and gondola) was made of a urethane coated nylon fabric. Although, when inflated, it was about 55 feet in diameter, and enveloped 5,500 cubic feet of air, it could be folded neatly into a bundle approximately 3½ feet wide by 1½ feet high and, when so folded, fit into a canvas bag. It weighed about 128 pounds.

As in most professions, there is a certain camaraderie among laundrymen, and Stair, through his subordinates at Up-to-Date, learned that Sinai Hospital had a machine large enough to wash Horan's balloon. In return for past favors done by Up-to-Date, Sinai agreed to handle this item; and so, on October 25, 1976, Mr. Horan, accompanied by Fred Jessop, a vice-president and manager of Up-to-Date, took the balloon to the laundry room at Sinai Hospital.

A number of Sinai employees were, of course, at work there — among them Edwin Zimmerman, the laundry manager, Steven Sebree, his assistant, and Ronald Scott, a "washman." In its collapsed state, the balloon was washed without incident. It was then put in the dryer.

This dryer is known in the trade as a Notrux Extractor. It was manufactured and sold to Sinai in 1958 by appellant, the American Laundry Machinery Company, now a division of McGraw Edison. The design of this machine is a critical element in this case, and will be described in some detail shortly. Suffice it at this point to note that it contained three main elements. The first was the "basket." This consisted of two semi-circular metal bins into which the wet laundry would be placed. The two bins, each a self-contained unit, would then be coupled together to form one circular receptacle divided along its diameter. The laundry in one part of the basket was thus kept separate from that in the other part, an important factor in this case. The exterior skin of this "basket" was perforated; through the holes water could (and was supposed to) escape. The basket fit into the second element — a round metal cylinder known as the "curb." This unit, itself stationary, spun the basket around inside of it at great speed — 750 RPM — which spinning action created an enormous centrifugal force that expelled the water from the laundry inside the basket. The "curb," in turn, was suspended from the floor by suspension rods housed in three large pylons or pedestals located equidistant around the curb. These pedestals were bolted to a steel slab that was itself bolted to the floor. The machine itself was thus immobile.

Anyone who has taken a course in high school physics, or has ever seen the family washing machine begin to shake,

rattle, and walk across the floor during the "spin" cycle, knows how powerful centrifugal force can be, and thus how important it is to balance the laundry load evenly. This is especially true with an 8,000-pound machine capable of spinning a 2,000-pound load (1,400 pounds of wet laundry and a 685-pound basket) at 750 revolutions per minute.

Thus, when the wet balloon (128 pounds dry weight) was put into one part of the basket, an equivalent amount of regular laundry was placed in the other part. The top was put on and the machine was started. It immediately "oscillated" — *i.e.,* it vibrated — and it was immediately shut off. The Sinai washman — Mr. Scott — wet down the Sinai laundry to add some weight to it and even out the balance, and the machine was started again. The same thing happened, and it was again shut down right away. More laundry and water was added, but, when restarted, it again shook and made a racket. Finally, on the fourth try, the "oscillation" tapered off. The machine ran smoothly — for less than a minute — when, without warning, it suddenly, instantaneously, came wildly apart and disintegrated, strewing shrapnel throughout the room. The parties characterized what happened as an "explosion." One piece of flying metal virtually amputated Fred Jessop's left arm, wiping out his wrist completely. Timothy Horan had his abdomen sliced open.

The threshold question, of course, is what caused this to happen. In a combined action by Horan and Jessop in the Superior Court of Baltimore City, the court and jury, by their respective decisions, concluded that the accident was attributable to defects in the machine itself, and not to any act or omission of the persons operating it. This was made manifest when (1) a directed verdict was entered by the court in favor of Sinai and its employees, as defendants in the original actions by Horan and Jessop, and in favor of Horan, Jessop, and Up-to-Date Laundry, as defendants in a third-party action brought by appellant; (2) the jury returned a verdict in favor of Horan against appellant for $335,425 ($210,425 in compensatory damages and $125,000 in punitive damages); and (3) it also returned a verdict in favor of Jessop against appellant in the amount of $874,637 ($674,637 in

compensatory damages and $200,000 in punitive damages).[1] The case against appellant was submitted to the jury on issues; and, with respect to each plaintiff, it found liability on the basis of *both* negligence and strict liability.

Appellant is obviously displeased with this result, and so it has appealed. It claims:

"I. There Was Insufficient Evidence of Negligence To Allow The Jury To Consider That Issue.

II. The Doctrine of Strict Liability Is Unconstitutional Generally And, As Applied Here, Specifically.

III. Even Assuming That Strict Liability Is A Constitutionally Permissible Doctrine It Is Not Applicable In This Case.

IV. Directed Verdicts Should Not Have Been Entered In Favor Of Sinai Hospital, Frederick Jessop and Up-To-Date Laundry.

V. Punitive Damages Could Not Be Properly Assessed In This Case.

VI. The Jury Was Allowed To Consider Financial Resources Not Relevant To The Case.

VII. The Court's Rulings On The Admissibility Of Evidence Were Improper."

We shall deal with these in the order presented, although, as will soon become apparent, it will not be necessary to decide the second, third, or sixth issues.

## (1) *Evidence of Negligence*

In *Moran v. Fabergé,* 273 Md. 538 (1975), the Court of Appeals concluded (p. 543) that "a manufacturer's duty to produce a safe product, with appropriate warnings and instructions when necessary, is no different from the

---

1. The jury also returned a verdict of $50,000 in favor of Mr. and Mrs. Jessop for loss of consortium. The fate of that judgment is linked to that of the other compensatory damages awarded.

responsibility each of us bears to exercise due care to avoid unreasonable risk of harm to others." As a result, the Court noted that "consumer suits" have been permitted against manufacturers based "purely on negligence concepts" for "defective design, negligent production, and failure to warn (or adequately warn) of latent dangers." *Id.,* at 543.

The actions by Horan and Jessop against appellant were indeed based in part upon a negligence theory, the particular negligence alleged being that of defective design and failure to warn of latent danger. Appellant claims that the evidence adduced in support of that theory was insufficient to permit it to be considered by the jury — in other words, that the court erred in denying its motion for directed verdict.

The standard to be applied in this regard is that stated in *Fowler v. Smith,* 240 Md. 240 (1965), as restated in *Curley v. General Valet Service,* 270 Md. 248 (1973), and confirmed in *Beahm v. Shortall,* 279 Md. 321 (1977); namely:

"... [N]egligence is a relative term, to be decided upon the facts of each particular case; that ordinarily it is a question of fact to be determined by the jury; that before it can be determined as a matter of law that one has not been guilty of negligence, the truth of all the credible evidence tending to sustain the claim of negligence must be assumed and all favorable inferences of fact fairly deducible therefrom tending to establish negligence drawn; that 'Maryland has gone almost as far as any jurisdiction that we know of in holding that meager evidence of negligence is sufficient to carry the case to the jury;' that the rule requires submission of the case to the jury if there be any evidence, however slight, legally sufficient as tending to prove negligence, the weight and value of such evidence being left to the jury.... The test of legal sufficiency, we have held, 'is whether the evidence serves to prove a fact or permits an inference of fact that could enable an ordinarily intelligent mind to draw a rational conclusion therefrom in support of

the right of the plaintiff to recover.' [citation omitted]."

*See also Impala Platinum v. Impala Sales,* 283 Md. 296, 329 (1978); *Summit Loans, Inc. v. Pecola,* 265 Md. 43 (1972).

The evidence in support of appellees' theories of negligence came primarily from their "expert" witness, Simon Tamny, whose testimony covered three principal elements: causation, foreseeability, and preventability of the accident.

## (a) *Causation*

In a nutshell, Mr. Tamny described what amounts to a three-step process that caused the extractor to disintegrate. First, he pointed out that the balloon was made of an essentially waterproof, or nonabsorbent, material, which would make the extraction (through centrifugal force) of water retained in it considerably more difficult than the extraction of water from ordinary laundry. Thus, although the load may have been fairly well balanced, as to weight, when the balloon and the other laundry were initially put into the basket, it would quickly become out of balance once the spinning action commenced. The water would rapidly be expelled from the side of the basket containing the ordinary laundry, because it could be pushed through the fabric itself; but, as to the balloon, the water would escape more slowly because of the more impervious nature of the fabric. This differential in the rate of expulsion (and, conversely, in the amount of water retained) created an increasingly significant weight differential, or imbalance, in the basket and thus as well in the "curb."

This developing imbalance, Mr. Tamny said, would, through the effect of centrifugal force, create a correspondingly increased amount of pressure within the machine, as it continued to pick up speed. This force, or pressure, may be considered the second step in the process; it manifested itself in the oscillation or vibration described by the various witnesses on the scene.

Tamny then described the machine itself, noting that there

was only a one-inch tolerance between the closest projection of the "curb" and the pedestals housing the suspension rods. With the build-up of enormous centrifugal force caused by the increasing weight imbalance, the "curb" would tend to move toward the pedestals. What occurred, the expert said, was that when the pressure reached a certain point, "the whole thing just walked to the point where the suspension wouldn't handle it any more, and the curb slammed into the pedestals and just proceeded to rip them apart, one, two, three."

### (b) *Foreseeability — Intended Use*

In *Moran, supra,* 273 Md. at 545, the Court considered a manufacturer's duty to warn of latent dangers as extending "to all [uses] which are reasonably foreseeable," but presumably not to uses that are not reasonably foreseeable. The same principle would also apply to his duty to design and manufacture a safe product. *See Phipps v. General Motors Corp.,* 278 Md. 337 (1976); *Lahocki v. Contee Sand & Gravel Co.,* 41 Md. App. 579 (1979), *rev'd on other grounds* 286 Md. 714.[2] The pertinent inquiry, in this instance, is not whether the harm that occurred — the actual use — was itself foreseeable, but rather whether it fell "within a general field of danger which should have been anticipated." *Segerman v. Jones,* 256 Md. 109 (1969), quoting from *McLeod v. Grant County School Dist. No. 128,* 255 P.2d 360 (Wash. 1953); also *Moran, supra,* at 551.

This becomes particularly significant in light of appellant's contention in this case. It complains that the machine in question was neither designed, nor expected to be used, to dry large balloons — that such a use was therefore an entirely unforeseeable one.

---

2. *Phipps* and *Lahocki* both involved the application of "strict liability" rather than pure negligence; but in this context that distinction has no meaning. Foreseeability of the harm sued upon (or harm of the general type sued upon) has always been a required element of actionable negligence; indeed, it would seem to be an even more critical element in an action based on negligence than one based upon "strict liability." *See Moran,* 273 Md. at 550, *et seq.*

In this regard, there was evidence adduced from two Sinai employees that, although they had never had occasion to wash and dry a balloon before, items made of the same or similar types of waterproof, nonabsorbent materials were routinely put through the extractor as part of the hospital's regular laundry. Items such as cubicle curtains, "rubber" sheets, laundry bags, and "slings" — some of which were quite large — were so processed without prior mishap. Mr. Tamny stated that, in terms of their potential effect on the extractor, these items were not substantially different than the balloon. Indeed, in discussing *appellant's* theory of what caused the accident (the balloon clogged up all the holes in the basket preventing any water from escaping), Mr. Tamny said that "these items that have been commonly extracted in the machine are just as capable of plastering up all the holes in the side of the half container as the balloon. The balloon material is not really much different from some of those materials." One curtain, he said, could have the same effect.

Appellant has not contended that the drying of these other items represented an impermissible or unforeseeable use of the machine.

Given the foreseeability of imbalances developing even from normal use, Tamny stated "obviously the design of this machine, it was capable of tearing itself apart." Recalling that the unit was bolted to the floor, this colloquy with Mr. Tamny is significant:

"Q How about commercial equipment where it is bolted to the floor?

A In a large unit that is tied to the floor, *the expectable thing is that the machine is going to tear itself apart.* These are very large heavy parts that are vibrating.

Q So that to that extent, are you able to say whether such as happened here was foreseeable by the manufacturer?

A Yes, certainly. I mean, I did a basic calculation of the amount of engineering that's tied up in this machine, just from the sizes of the parts and how

fast they're moving, *and it's immediately obvious that the machine has the capacity for self-destruction.*" (Emphasis supplied.)

In this same vein, Tamny later said:

"Q You use the word capable of destroying itself. Based upon your investigation, is it reasonable to assume that what did happen, in fact, would happen in a hundred per cent of the cases if it were not capable of being shut off by a safety device?

A Well, with the amount of unbalance that occurred in this machine, *any time you repeated those conditions of unbalance at that speed, the machine would do the same thing, tear itself apart.*" (Emphasis supplied.)

### (c) *Preventability*

As noted, the plaintiffs alleged both a defective design and an omission to warn of latent danger. These are quite different things, and will be considered separately.

With respect to defective design, it was shown that in 1926 — some 32 years before the manufacture and sale of the machine in question — appellant obtained a patent on an automatic cut-off device designed for use on an extractor of a type similar to the Notrux. The patent states, in part:

"This invention relates to improvements in centrifugal extractors.

"The objects of this invention are to provide means for limiting the oscillation of the rotating basket of the extractor; to provide automatic means for cutting out the motor should the amplitude of oscillation of the basket exceed a predetermined amount; and furthermore to provide dynamic braking means for slowing down and stopping the motor upon being automatically cut out by excessive oscillation of the basket."

This device, Tamny said, is commonly used by other

manufacturers, but has never been used by appellant. It would have cut off the power to the machine, and thus immediately commenced to slow it down, before the oscillation built up to the point of causing the machine to disintegrate. Tamny stated, in particular: "... [T]hese switches are typically set to kick out at about fifteen percent of the dry weight capacity in unbalance. As the cut out switch doesn't wait until the machine is swung one inch off center before it kicks out, it will kick out at relatively smaller levels of vibration. What it does is it catches the problem early enough that you can shut the machine down, bring it to a stop without tearing it apart." His ultimate conclusion was that, had this device, costing $50 or less, been placed on the Notrux, "it would have prevented what happened. That's what it is designed to do and that's what this type of device does millions of times a year on home washing machines when the loads go out of balance. It shuts the machine down."

It was conceded that appellant gave no warnings with respect to nonabsorbent materials in any of the manuals it published relating to the machine. Customers were not told to refrain from putting such materials in the extractor; nor were they warned to balance such items with similar items, rather than with ordinary laundry. In no way were they alerted to the danger inherent in placing nonabsorbent items in one part of the basket and absorbent items in the other. Mr. Tamny's comment:

> "Well, you know, obviously the very least they could have done was to warn people about the inherent danger of the machine, the fact that under certain kinds of conditions it was capable of destroying itself and what to do about preventing those conditions from happening."

Having summarized the evidence in support of appellees' claim, we return once more to *Moran,* 273 Md. at 552:

> "Based on this negligence law we think that in the products liability domain a duty to warn is imposed on a manufacturer if the item it produces has an inherent and hidden danger about which the

producer knows, or should know, could be a substantial factor in bringing injury to an individual or his property when the manufacturer's product comes near to or in contact with the elements which are present normally in the environment where the product can reasonably be expected to be brought or used."

In the context of the rules laid down in *Fowler v. Smith, supra,* 240 Md. 240, and its "progeny," there was surely sufficient evidence here to overcome appellant's motion for directed verdict, and thus to require the issue of negligence to be resolved by the jury. The evidence recounted above, if believed, sufficed to establish that the accident (and thus the injuries) resulted from appellant's negligence in designing and selling a machine that, absent an automatic cut-off switch, would, under foreseeable circumstances, become a dangerous instrument, as well as in failing to warn customers of that foreseeable potential danger.

### (2) (3) *Strict Liability*

As its second and third issues, appellant contends that the doctrine of "strict liability" is unconstitutional, and that, even if it is constitutional, the evidence was insufficient to establish its liability under that theory.

Because the jury based its verdicts independently upon a finding of appellant's negligence — a finding that we have concluded was entirely permissible — the questions raised as to strict liability are moot. Even if we concurred with appellant on these two issues, or either of them, the judgments appealed from would be unaffected. We therefore find no need to consider the second and third issues. *See,* however, *Phipps v. General Motors Corp., supra,* 278 Md. 337, in which the Court of Appeals, after an exhaustive analysis of the doctrine, stated flatly, at p. 353: "Therefore, we adopt the theory of strict liability as expressed in § 402A of the

Restatement (Second) of Torts." *Also Lahocki v. Contee Sand & Gravel Co., supra,* 41 Md. App. 579.[3]

### (4) *Negligence of Sinai Hospital, Jessop, and Up-to-Date Laundry*

We are told by appellant in its brief that it filed a third-party action against Jessop and Up-to-Date Laundry, although, as that pleading was not included in the record extract, it is not entirely clear upon what basis this was done — what acts or omissions on their part appellant asserted would render them liable to it. Appellant says nothing about a third-party action or cross-claim against Sinai or any of its employees, although they were initially sued by Horan and Jessop.

Notwithstanding these omissions, it now asserts that the court erred in directing verdicts in favor of these defendants, or third-party defendants. Its contention is that, by putting the balloon in the extractor without inquiring whether it was proper to do so, and by failing to remove it after the machine began vibrating on the first two or three attempts, these defendants also exhibited varying degrees of negligence contributing to the accident, and that the jury was entitled to consider the question of their relative culpability.

In the first place, there was no evidence that any of these individuals had any prior knowledge that the extractor was incapable of safely drying the balloon. As noted, there were no warnings to that effect given in any of appellant's manuals. The machine had been routinely used in the past to dry similar types of material.

What is even more telling, however, is that appellant's own expert witness, Ralph Barnett, absolved these people of any responsibility for the accident. On cross-examination, he said, in relevant part:

"Q   Mr. Barnett, at the time of your deposition you stated that this accident occurred through no fault of anyone?

---

3. We would also observe that, based upon the record before us, it does not appear that appellant ever raised the Constitutional issue presented here in the trial court. We therefore would decline to review it as well under Maryland Rule 1085.

A   That's correct. I believe it's an unforeseeable misuse of this machine, that nobody could have predicted anything like this, it's so bizarre.

Q   *And you absolve everybody of any responsibility who had anything to do with this machine?*

A   *Yes, I do.* It's the first time in 4900 cases that I have ever had a situation like this before.

Q   That includes Mr. Scott, Mr. Zimmerman, Mr. Jessop, Mr. Sebree?

A   That's correct.

Q   Mr. Horan?

A   That's correct. Everybody.

Q   *And that's your expert opinion, that nobody did anything wrong?*

A   *That's correct. What they did wrong, there was no way in the world for them to know that beforehand."* (Emphasis supplied.)

Appellant, it seems to us, is hard-pressed to complain that the court concurred in the opinion expressed by its own (and only) expert witness, particularly when there was no substantial evidence to contradict it. We find no error in the court's direction of verdicts in favor of these other defendants and third-party defendants.

### (5) *Punitive Damages*

As noted earlier, the case against appellant was submitted to the jury upon two distinct legal theories — negligence and strict liability; and it found appellant liable under both theories. In presenting the issue of punitive damages, the court, in its instructions, drew no distinction between these alternate theories of liability, and thus allowed the jury to consider and award such damages upon either basis of liability.

As the Maryland Court of Appeals has yet to consider the availability *vel non* of punitive damages in a product liability case, much less the conditions under which such damages may be awarded, we are in virgin territory as to this issue.

We must be especially careful, therefore, not to range beyond that which must, of necessity, be decided in this case.

In that regard, we need not, and do not, consider in this case whether or under what circumstances punitive damages are allowable where the verdict as to liability necessarily rests upon a strict liability theory. Because the jury expressly found negligence in this case, we may and do confine our consideration of the issue to that circumstance. We shall restate the issue in these terms: (1) are punitive damages allowable in a product liability action based upon the manufacturer's negligence; (2) if so, under what conditions — specifically, will anything less than a showing of "actual" malice suffice to permit such damages; and (3) whatever the test, did the evidence in this case suffice to satisfy it?

The Court of Appeals has considered the availability of punitive damages in many different contexts, and certain general guidelines may be distilled from these cases. They are essentially as follows:

(1) Punitive damages are not recoverable at all in actions for breach of contract. *H & R Block, Inc. v. Testerman,* 275 Md. 36, 44 (1975) — hereafter referred to as *Testerman.*

(2) Such damages are recoverable in tort actions if malice is shown. The type or degree of malice required depends upon the nature of the tort.

(3) Actual or express malice requires an intentional or wilful act (or omission). It "has been characterized as the performance of an act without legal justification or excuse, but with an evil or rancorous motive influenced by hate, the purpose being to deliberately and willfully injure the plaintiff." *Testerman,* at p. 43;[4] *Drug Fair v. Smith,* 263 Md. 341 (1971).

(4) Implied malice, on the other hand, involves something less than actual malice.

(5) To support an award of punitive damages in a tort action arising from the operation or entrustment of a motor vehicle, what must be shown is a "wanton or reckless

---

4. As will be seen, this is a more stringent definition than that adopted by the Restatement of Torts and by most courts that have considered the question; but it is the one that applies in Maryland.

disregard for human life ... with the known dangers and risks attendant to such conduct. . . ." *Smith v. Gray Concrete Pipe Co.,* 267 Md. 149 (1972); *Testerman,* 275 Md. at 47. This is a standard, the Court said, "which, although stopping just short of wilful or intentional injury, contemplates conduct which is of an extraordinary or outrageous character. . . ." *Smith* at 168. Such a showing, in such an action, amounts to the "legal equivalent" of actual malice. *Smith* at 168.

(6) Where the tort arises from neither a contractual relationship nor the operation of a motor vehicle, the malice necessary to warrant punitive damages has been defined as "conduct of an extraordinary nature characterized by a wanton or reckless disregard for the rights of others." *Wedeman v. City Chevrolet Co.,* 278 Md. 524, 532 (1976); *St. Paul at Chase v. Mfrs. Life Insur.,* 262 Md. 192, 239 (1971).[5]

(7) Where the tort arises out of a contractual relationship, actual, rather than implied, malice is required. *Testerman, supra,* 275 Md. at 44. *See also Aeropesca Limited v. Butler Aviation International Inc.,* 44 Md. App. 610 (1980).

(8) In the context of awarding punitive damages, a tort will be deemed to arise out of a contractual relationship only if "the tortious conduct and the contract were so intertwined that one could not be viewed in isolation from the other," or, in other words, if, "[i]n one form or another, then, the tort arose directly from performance or breach of the contract." *General Motors Corp. v. Piskor,* 281 Md. 627, 637 (1977). Restated again in *Piskor* at 640:

> "In order, then, for an alleged wrong to constitute a 'tort arising out of a contractual relationship,' thereby necessitating proof of common law actual malice to permit recovery of punitive damages, we require that there be a direct nexus between the

---

5. To some extent, this definition, or test, is quite similar to that prescribed for motor vehicle torts. But there is at least one distinction that the Court emphasized in *Testerman,* 275 Md. at 47; *i.e.,* in the motor vehicle tort, the wanton or reckless disregard must be "for human life," rather than "for the rights of others." Where personal injuries are in fact sustained, however, and are a foreseeable consequence of the alleged negligence, it is difficult to see that this distinction will have any practical significance.

tortious act and performance or breach of the terms and conditions *of the parties' underlying contract."* (Emphasis supplied.)

This is the framework within which we address the three issues restated by us.

### (a) *Availability Per Se*

We note, initially, that there is nothing in any of the Maryland cases to suggest that punitive damages, *per se,* would not be recoverable in a product liability action based on negligence — that there exists some policy reason not to treat such cases in the same manner as other tort actions in that regard. Nor have other courts around the country tended to draw such a distinction.

Despite an alarm sounded by Judge Friendly in *Roginsky v. Richardson-Merrell, Inc.,* 378 F.2d 832 (2nd Cir. 1967),[6] most courts that have considered the matter have recognized the availability of punitive damages, under certain

---

6. Judge Friendly was dealing with the harmful side effects of a drug that had been marketed nationwide, and that had already produced some 1500 lawsuits around the country — 75 in the Southern District of New York alone. In all, or most, of these cases, punitive damages were sought. Three in California, New York and Washington, had proceeded to judgment and resulted in substantial awards of punitive damages. Friendly's principal concern was over the cumulative effect of such awards; "[t]he legal difficulties engendered by claims for punitive damages on the part of hundreds of plaintiffs are staggering," he wrote. "We have the gravest difficulty in perceiving how claims for punitive damages in such a multiplicity of actions throughout the nation can be so administered as to avoid overkill." 378 F.2d at 839. He also observed that the burden of this expense would be placed either upon innocent shareholders of the corporate defendant, who were not involved in the wrongdoing, or, if the expense were an insurable one, upon the public generally in the form of higher prices reflecting the cost of the insurance. The expression of this caveat was in the nature of *dicta,* however. Punitive damages were denied in *Roginsky* because the evidence was held to be insufficient to show that the top level management of the corporate manufacturer authorized or participated in the alleged concealment (failure to warn), which was a requirement for punitive damages under New York law. It should be noted that the California court, in *Toole v. Richardson-Merrell, Inc.,* 251 C.A.2d 689 (1967), a similar lawsuit involving the same product and the same defendant, disagreed with Judge Friendly's analysis of the evidence, and concluded that management had participated in the wrongdoing. *See also* a critique of *Roginsky* in *Punitive Damages in Products Liability Litigation,* 74 Mich. L. Rev. 1257, 1299, et seq. (1976), an excellent and exhaustive article by Professor David G. Owen. *Also Allowance of Punitive Damages in Product Liability Claims,* a less exhaustive article appearing in 6 Ga. L.R. 613 (1973).

circumstances, in products liability cases based upon negligence in the design or manufacture of the item or in a failure to warn of latent danger.[7] In most of these cases, the focus was on the *circumstances* under which such damages would be allowed rather than on the threshold question of whether they would be allowed at all. That was more or less assumed, especially in those cases affirming such awards. There was some discussion of the *vel non* issue in *Rinker v. Ford Motor Co.*, 567 S.W.2d 655, at 668 (Mo. App. 1978), where the Missouri Court said:

> "Appellant advances the argument that punitive damages are 'inappropriate' in a products liability case such as this.[8] As appellant suggests, no case in this State relied upon by either party has approved of punitive damages in a products liability case. However, given the purpose of punitive damages to punish a defendant for an aggravated act of

---

7. *See, for example, Toole v. Richardson-Merrell, Inc.*, 251 C.A.2d 689 (Cal. App. 1967); *Rinker v. Ford Motor Co.*, 567 S.W.2d 655 (Mo. App. 1978); *Moore v. Jewel Tea Company*, 253 N.E.2d 636 (Ill. App. 1969), *aff'd* 263 N.E.2d 103 (1970); *Hoffman v. Sterling Drug, Inc.*, 485 F.2d 132 (3rd Cir. 1973), applying Pennsylvania law; *Heil Co. v. Grant*, 534 S.W.2d 916 (Tex. Civ. App. 1976); *Drake v. Wham-O Manufacturing Company*, 373 F. Supp. 608 (E.D. Wisc. 1974), applying Wisconsin law; [but compare *Walbrun v. Berkel, Incorporated*, 433 F. Supp. 384 (E.D. Wisc. 1976), reaching an exactly opposite conclusion]; *Knippen v. Ford Motor Co.*, 546 F.2d 993 (D.C. Cir. 1976); *Gillham v. Admiral Corporation*, 523 F.2d 102 (6th Cir. 1975). *Cf. Johnson v. Husky Industries, Inc.*, 536 F.2d 645 (6th Cir. 1976), applying Tennessee law; *Drayton v. Jiffee Chemical Corp.*, 591 F.2d 352 (6th Cir. 1978), applying Ohio law; *Auto Specialties Mfg. Company v. Boutwell*, 335 So. 2d 291 (Fla. App. 1976), overruled on other grounds in *Goodyear Tire & Rubber v. Hughes Supply, Inc.*, 358 So. 2d 1339, 1343 (Fla. 1978); *Hafner v. Guerlain, Inc.*, 310 N.Y.S.2d 141 (1970); *Pease v. Beech Aircraft Corporation*, 38 C.A.3d 450 (Cal. App. 1974); *G. D. Searle & Co. v. Superior Court*, 49 C.A.3d 22 (Cal. App. 1975); *Newding v. Kroger Co.*, 554 S.W.2d 15 (Tex. Civ. App. 1977). In a number of these cases, punitive damages were not, in fact, allowed. The courts rested their decision, however, on the insufficiency of the evidence to support such an award, and implied that had the evidence been sufficient to meet the applicable standard, punitive damages would have been available.

8. *Rinker* involved an action by the driver of a Ford automobile involved in an accident that occurred when the àccelerator pedal stuck. This, in turn, was caused by the failure of a nylon cam in the carburetor. The plaintiff sued both on strict liability and negligence theories, claiming that Ford knew or should have known that nylon was an inappropriate material for the cam — that other plastics were available. The jury returned a verdict on the negligence count and awarded substantial punitive damages, which was affirmed on appeal.

misconduct and to deter similar conduct in the future by the defendant and others, there is no fundamental reason for excluding products liability cases from the cases in which punitive damages may be recovered."

Discussing then Judge Friendly's concerns expressed in *Roginsky, supra,* and the contrary views taken elsewhere, the Court concluded, at p. 669:

"Appellant's authorities and the argument based thereon are not persuasive that this court should, as a matter of public policy, refuse to permit punitive damages in a case such as this. The problems suggested by appellant will be dealt with as they arise. Means are available to both trial and appellate courts of the state for the control of excessive award of punitive damages."

Coupling this authority, and the rationale in support of it, with the current framework of the Maryland cases, we conclude that punitive damages are available in product liability actions based upon the manufacturer's negligence.[9]

### (b) *What Kind of Malice is Required?*

We again advert to the Maryland rulings that to recover punitive damages in a "pure" tort action, "conduct of an extraordinary nature characterized by a wanton or reckless disregard for the rights of others" will suffice as the legal equivalent of "actual" malice, whereas with respect to a tort arising out of a contractual relationship, "an evil or rancorous motive influenced by hate, the purpose being to deliberately and willfully injure the plaintiff" — *i.e.,* "actual" malice — must be shown. *See, supra,* pp. 111, 112.

---

9. It is of interest to note that, in the Model Uniform Product Liability Act, drafted and proposed by the U.S. Department of Commerce, punitive damages are allowable, the Department's comment being that such damages "serve an important function in deterring product sellers from reckless disregard for safety in the production, distribution, or sale of dangerous products." *See* § 120 (and ensuing analysis), published in 44 FR 62713, 62748 (10/31/79).

Product liability actions may rest on a number of legal theories, some *ex contractu* in nature (such as breach of warranty), others *ex delicto* in character (negligence, fraud, and, more recently, "strict liability," which, it has been suggested, is akin to a theory of negligence *per se*). *See* 74 Mich. L. Rev. 1257, 1269. Whatever the theory pled and argued, the underlying contention in these cases is that a defective product capable (or likely) of producing injury was placed on the market; and that process of marketing normally involves a contract of some sort. In a very real sense, therefore, a product liability action is one that arises out of a contractual relationship. But it is not, in this case at least, a contractual relationship to which the plaintiff-appellees were parties. The tort here did not arise from any contract entered into by Horan and Jessop. The standard to be applied, therefore, is not that stated in *Testerman,* but rather the "legal equivalent" implied malice standard normally applicable in tort cases.

The courts in other jurisdictions are in substantial agreement that reckless or wanton conduct will suffice to support an award of punitive damages — that "actual" malice as defined in *Testerman* is not required. In some States by interpretation of statute,[10] in others by court rule,[11] in yet others by court decision,[12] the standard applied in these cases is essentially that stated in Restatement of Torts (Second), § 908: "Punitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive *or his reckless indifference to the rights of others.*" (Emphasis supplied). *Compare* Prosser, *Torts,* 4th Ed., § 2, pp. 9, 10.

The latter part of the Restatement criterion is quite similar to that expressed by our Court of Appeals in *Wedeman, supra,* 278 Md. at 532, for tort cases generally, and is essentially the test adopted by the trial court in its

---

10. *E.g.,* California. *See* Calif. Civil Code, § 3294.

11. *E.g.,* Missouri. *See* Missouri Approved Jury Instructions (MAI), § 10.02.

12. *E.g., Hoffman v. Sterling Drug, Inc., supra,* 485 F.2d 132; *Drake v. Wham-O Manufacturing Company, supra,* 373 F. Supp. 608; *Knippen v. Ford Motor Co.,* 546 F.2d 993 (D.C. Cir. 1976); *Thomas v. American Cystoscope Makers, Inc.,* 414 F. Supp. 255, 264 (E.D. Pa. 1976).

instructions to the jury in this case.[13] Whether stated as "wanton or reckless disregard for the rights of others" or as "reckless indifference to the rights of others," it is, we think, the correct standard to be applied in a product liability action.

### (c) *Evidence of Wanton or Reckless Disregard*

The only evidence offered in support of appellees' entitlement to punitive damages in this case was that which established appellant's negligence: failure to use the patented cut-off device and failure to warn of the danger involved in misloading absorbent and nonabsorbent materials. From this, appellees seek to infer the requisite wanton and reckless disregard (there being no evidence whatever of "actual" malice as defined in *Testerman*). It will not suffice, however.

Wanton and reckless conduct requires far more than mere negligence, or what may be casually inferred from it. *See* Restatement, *supra,* § 908. It requires, in this context, direct evidence of substantial knowledge on the part of the manufacturer that the product is, or is likely to become, dangerous, and a gross indifference to the danger. Such evidence simply does not exist in this case.

The machine in question was not inherently dangerous under normal use. Indeed, for 18 years, Sinai dried all sorts of materials absorbent and nonabsorbent — in it without mishap. There was no evidence that any of these, or similar, types of Notrux extractors had ever before disintegrated in this fashion, or had come close to it. Nor was there evidence that appellant had received any prior complaints about the machine or that it had in any way been declared unsafe prior to the sale to Sinai or prior to the accident. This is in sharp contrast to the level of knowledge possessed by the manufacturers in those cases cited *supra* in footnote 7.

---

13. The court defined "implied malice" as "a wanton disposition, grossly irresponsible to the rights of others, or extreme recklessness, or utter disregard for the rights of others, or in other words, conduct of an extraordinary and outrageous character." Although appellant objected to the submission of the issue of punitive damages to the jury, it made no objection to the form of this instruction. *Compare* Maryland Pattern Jury Instruction, § 7:6.

There is nothing in this record to show *why* the patented device was not used on this particular machine — whether appellant had some reason not to use it, or simply never considered its use. It was originally designed for use in an extractor containing a single "basket," rather than the two-piece unit used in the Notrux. Neither is there anything to show that appellant ever really expected the machine to be used as it was in this case, even though, for purposes of establishing negligence, such a use was within a general class of use that was "foreseeable."

In short, the conduct here, as documented in the record, may have been negligent, but not wanton or reckless. The evidence did not support an award of punitive damages, and the court therefore erred in submitting that issue to the jury.

### (6) *Consideration of Appellant's Financial Resources*

Our conclusion just stated makes it unnecessary to consider appellant's sixth issue.

### (7) *Evidentiary Rulings*

Finally, appellant raises four evidentiary issues, which we find to be without substantial merit.

Its first complaint is that the court permitted the jury to view two slide photographs of Mr. Jessop's nearly amputated arm. This occurred during the course of Dr. Weiland's testimony as to the nature of Jessop's injuries and the procedures used to correct and heal them. The photographs are a bit gory, to be sure, but we find no abuse of discretion in allowing them. They were accurate depictions of Mr. Jessop's condition and were relevant to Dr. Weiland's explanation of what had happened to Mr. Jessop and the difficulties involved in repairing the damage. *See Nolan v. Dillon,* 261 Md. 516, 527-28 (1971).

The other three complaints concern the examination and cross-examination of the two expert witnesses — Mr. Tamny and Mr. Barnett. Many of the questions complained of here were asked and answered without objection from appellant.

It can hardly complain about them now. The others were not patently offensive, and, at worst, involved judgment calls well within the discretion normally accorded to the trial judge.

> *Judgments for compensatory damages affirmed; judgments for punitive damages reversed; costs to be paid one-half by appellants, one-half by appellees.*