544 A.2d 808

**Janice L. ROEBUCK**

v.

**R. Calvert STEUART.**

**No. 1582, Sept. Term, 1987.**

Court of Special Appeals of Maryland.

Aug. 3, 1988.

**300**

Steven M. Pavsner (Caren Z. Schindel and Joseph, Greenwald & Laake, P.A. on the brief), Greenbelt, for appellant.

Ronald G. Dawson (Smith, Somerville & Case on the brief), Annapolis, for appellee.

Argued before MOYLAN, BISHOP and POLLITT, JJ.

POLLITT, Judge.

This convoluted conglomeration of claims compels a certain circumlocution in its consideration. Our chore is complicated by counsel's non-compliance with Rules 8–501(h) and (i) (formerly Rule 1028 a) concerning the Table of Contents and Format of the Record Extract.[1]

Appellant and cross appellee, Janice L. Roebuck, and others, were sued in the Circuit Court for Prince George's County as guarantors of the debts of Express Liquors, Inc., a bankrupt corporation, by six liquor suppliers of that corporation. Alleging that any liability on her part to those creditors was caused by the conduct of her attorney, R.

---

1. Rule 8–501(h) provides, in pertinent part:
 ... If the record extract is produced as a separate volume, it shall be prefaced by its own table of contents. The table of contents shall (1) reference the first page of the initial examination, cross-examination, and redirect examination of each witness and of each pleading, exhibit, or other paper reproduced and (2) identify each document by a descriptive phrase including any exhibit number.
 Rule 8–501(i) provides, among other things:
 ... Asterisks or other appropriate means shall be used to indicate omissions in the testimony or in exhibits. Reference shall be made to the pages of the record and transcript. The date of filing of each paper reproduced in the extract shall be stated at the head of the copy....
 The "table of contents" refers simply to "Trial Testimony" from various dates. Partial, incomplete, and sometimes erroneous indexes to that testimony appear at E–378, E–533 and E–606. Omissions are not indicated. Numerous documents contain neither filing date nor exhibit number and no indication of whether or when they were received in evidence. Similarly, the appendix to appellee's brief contains bits and pieces of testimony and arguments before the trial court with no table of contents or other guide to its use.

Calvert Steuart, appellee and cross appellant, Ms. Roebuck filed a third party claim against Steuart, demanding indemnification from Steuart for any judgment entered against her in favor of those creditors. Rule 2–332(a). She added two other counts to her "Third Party Complaint," alleging "legal malpractice" and "breach of fiduciary duty" against Steuart. In those counts, she sought compensatory and exemplary damages from Steuart based on (1) a judgment for $60,238.85 entered against her in the Bankruptcy Court for the District of Maryland in favor of Suburban Bank, another creditor of Express Liquors, Inc., and (2) the loss of $22,379.36, the proceeds from the sale of her home, which she had paid toward the debts of Express Liquors. Both of these losses she attributed to improper action or inaction by Steuart as her attorney.

Prior to trial, judgment was entered against Roebuck in favor of the liquor suppliers. Those claims are no longer a part of the case. At the conclusion of Roebuck's case, the circuit court granted Steuart's motion for judgment as to Roebuck's indemnity claim on those judgments. The trial court also ruled that there was insufficient evidence to permit jury consideration of the issues of punitive damages, attorney's fees or mental anguish.

The jury found, on special issues submitted, that Steuart's malpractice caused Roebuck to lose the proceeds from the sale of her home and to suffer a judgment in favor of Suburban Bank in the amount of $60,000. The court entered judgment in favor of Roebuck against Steuart for $22,379.36, and further ordered that "Janice L. Roebuck may hereafter have judgment against R. Calvert Steuart for the amount (not to exceed Sixty Thousand Dollars ($60,000.00)) which she proves she has paid to Suburban Bank on its judgment against her, including interest on said judgment." Both sides appealed.

On her appeal, Roebuck raises the following issues:

I. Did the trial court err in deciding that the verdict of $60,000 in favor of Roebuck as damages for the

adverse Suburban Bank judgment should be contingent upon her payment of that judgment?

II. Did the trial court err in deciding that Roebuck did not prove that she would have terminated her revocable liquor supplier guarantees if so advised, or what her liability would have been had she terminated the guarantees, and in therefore precluding the jury from considering the adverse liquor suppliers' judgments as an element of Roebuck's compensatory damage?

III. Did the trial court err in deciding that the facts showing attorney Steuart's reckless disregard for his client's legal rights were insufficient as a matter of law to support punitive damages, attorney's fees or recovery for mental anguish?

On his cross appeal, Steuart questions:

A. Whether Roebuck's claim for indemnity on the Suburban Bank judgment was barred by the doctrine of *res judicata?*

B. Whether Roebuck's claims as to the Suburban Bank judgment and the loss of the proceeds from the sale of her home were proper "Third Party" claims?

C. Whether the trial court should have granted Steuart's motion for judgment because:

1. There was no evidence that Roebuck's investment of the $22,379.36 was in reliance on Steuart's statements or omissions?

2. There was no evidence that Steuart's conduct was the proximate cause of the Suburban Bank judgment against Roebuck?

We shall reverse the trial court's order making the $60,-000 judgment contingent upon Roebuck's payment of Suburban's judgment against her, and affirm the judgment as to the remaining issues.

### Facts

From April of 1973 until May of 1983 appellant, Janice L. Roebuck, was married to John Oliverio. In May of 1976,

Oliverio and Mr. and Mrs. Howard Harrison purchased Express Liquors, Inc., becoming its sole stockholders. Appellee, R. Calvert Steuart, attorney, represented Oliverio in the purchase of the business, and thereafter represented Express Liquors, Inc., Oliverio and Roebuck in various corporate and personal legal matters. Roebuck testified that Steuart prepared her will, advised her in a child custody matter, represented her when she was personally sued, and generally fulfilled the role of her "personal attorney." Although she was neither an officer nor a stockholder of Express, Roebuck joined with Oliverio and the Harrisons in the execution of guarantees to wholesale liquor suppliers to induce those suppliers to extend credit for inventory delivered to Express. Steuart was aware of the guarantees, which were revocable upon written notice.

While the specific chronology is not altogether clear, it appears that sometime in 1977 or 1978 the Harrisons' stock was redeemed by Express. Shortly thereafter, Steuart purchased 45% of the stock and later acquired the remaining 5%. Thus, by early 1979, Oliverio and Steuart each was the owner of 50% of Express. Sometime during this period, Suburban Bank made loans to Express totaling $60,000. These loans were personally guaranteed by Oliverio, Roebuck, and Mr. and Mrs. Steuart.

Sometime in late 1980, Oliverio began to "float" or "kite" checks between two Express Liquors bank accounts at First American Bank and Equitable Bank. There was evidence from which the jury could find that this scheme was with the knowledge and consent of Steuart, who at that time was an owner of Express and was performing bookkeeping functions for the company. Oliverio testified that checks were written by him based on Steuart's promises to "get the money" in time to cover them, which Steuart did not "get." Roebuck had no knowledge of the financial situation at that time.

On 30 July 1981, First American Bank notified Oliverio that it was aware of his check kiting scheme and that Express was overdrawn by $87,000. Oliverio discussed the

matter with Steuart, who "explained" that the "kite" was actually only one-half that amount because it was between two banks. Oliverio then informed Roebuck of the situation.

Oliverio and Roebuck were to settle for the sale of their jointly owned home on the next day, and expected to receive $44,000 from that settlement. Oliverio asked Roebuck to agree to the application of the proceeds from that sale to save the business and to save him from going to prison. Roebuck tentatively agreed, with certain conditions, one of which was that her contribution of the proceeds of that sale would accomplish the intended result. Her subsequent discussions with Steuart, and his advice to her on that subject, are more fully set forth in the discussion of part C(1) of Steuart's cross appeal, *infra*. Suffice it to say at this point that Steuart told Roebuck he was aware of the check kiting, that he had suggested it, and that $35,000 would "take care of the problem."

On 7 August 1981, Equitable Bank, which had discovered overdrafts in the Express Liquors account in the amount of $167,958.60, filed suit and attached the assets of Express Liquors, causing the business to be closed. Under the local liquor laws, a closing for more than ten days would result in a forfeiture of the liquor license. The parties agreed to an extension and began negotiations toward settlement of the debt. Equitable agreed to consider releasing the attachment to permit a sale of Express and to consider financing part of the purchase by an acceptable owner. Steuart located a purchaser, Jin–Mar, Inc. et al., at a price of $256,537.12. A contract was signed on or about 3 September 1981 between the buyers and Steuart and Oliverio as sellers. Available proceeds of the sale were to be applied to selected debts. One of the creditors to be satisfied was Suburban Bank, which held outstanding notes of Express, guaranteed by Steuart, Oliverio and Roebuck, approximating $60,000. Suburban agreed to accept $20,000 cash and a note from the buyers for $40,238.85. This new note was guaranteed by Steuart but not by Roebuck.

In December of 1981, Express Liquors, Inc., was placed in involuntary bankruptcy. The trustee in the bankruptcy case instituted proceedings in the bankruptcy court to avoid the sale and to recover the proceeds paid to Equitable and Suburban. The bankruptcy court, among other things, held that the trustee could recover from Suburban the $20,000 cash and the note for $40,238.85 as avoidable preferences. That court held the note from Jin–Mar, Inc., guaranteed by Steuart, was void and, therefore, the original notes, guaranteed by Steuart, Oliverio and Roebuck, were reinstated. The court further found that Steuart's guarantee of the new note was a novation, releasing him from the original guaranty, but entered judgment in favor of Suburban against Roebuck in the amount of $60,238.85, based on her guaranty of the original notes. No part of this judgment has been paid.

Further facts will be supplied as necessary in the discussion of the various issues.

## I

The trial court erred in making Roebuck's $60,000 judgment against Steuart contingent upon her payment of the Suburban Bank judgment.[2]

The resolution of this question depends upon whether the "judgment rule" or the "prepayment rule" applies to this case. That question usually arises in actions on indemnity contracts. As explained by Judge Smith for the Court of Appeals in *Levin v. Friedman*, 271 Md. 438, 317 A.2d 831 (1974), if the contract is an "indemnity against liability," recovery from the indemnitor is allowed when judgment is entered against the indemnitee, even though it

---

**2.** Steuart correctly observes in his brief that this issue would become moot by a holding in his favor that this judgment is barred because (1) of the doctrine of *res judicata*, or (2) it is an improper third party claim, or (3) it was not caused by any act or omission of Steuart. For reasons to be discussed *infra*, we shall reject Steuart's argument on all those issues.

has not been paid, (the judgment rule), but if the contract is an "indemnity against loss or damage" (strict indemnity), the indemnitee cannot recover from the indemnitor until payment is made or he has otherwise suffered actual loss or damage (the prepayment rule). Obviously, this case is not a suit on an indemnity contract and such cases are inapposite. Equally inapplicable is *Baltimore County v. Stitzel,* 26 Md.App. 175, 184–85, 337 A.2d 721, 727, *cert. denied,* 275 Md. 745 (1975), cited by appellee, where this Court, citing provisions of The Uniform Contribution Among Tort–Feasors Act (Maryland Code (1957, 1986 Repl.Vol., 1987 Cum. Supp.), Art. 50, §§ 16–22), held that "[a] joint tort-feasor is not entitled to a money judgment for contribution until he has by payment discharged the common liability or has paid more than his pro rata share thereof." *See also Cotham and Maldonado v. Board,* 260 Md. 556, 273 A.2d 115 (1971); *Southern Maryland Oil Company v. Texas Company,* 203 F.Supp. 449 (D.Md.1962) and cases there cited. This is not a suit for contribution or indemnification among joint tort-feasors, who are identified as "two or more persons jointly or severally liable in tort for the same injury." Maryland Code, Art. 50, § 16(a). This is a tort action for alleged professional malpractice.

In *Hernandez v. Great American Ins. Co. of N.Y.,* 464 S.W.2d 91, 94 (Tex.1971), the Supreme Court of Texas said:

This strict indemnity limitation is inconsistent with the law of tort liability where the injured party is entitled to recover, as nearly as possible, compensation for the damages he suffers. This includes his expenses, past and future, paid or unpaid, to which he has been or will be put as a consequence of the tort. He need not prove payment of his medical bills, for example, to include them within his damages for which the tortfeasor is liable.

That case was a suit by the insured seeking reimbursement from his insurer for negligent failure to settle a claim within policy limits resulting in a judgment against the insured. Observing that "[i]f the insured is too poor to pay the first judgment, it is the insurer responsible for the

judgment who escapes with what he should pay," the Court held the judgment rule should prevail over the prepayment rule.

Texas has also applied the judgment rule to cases of alleged malpractice by attorneys. In *Montfort v. Jeter*, 567 S.W.2d 498 (Tex.1978), a $40,000 judgment had been entered against the client due to the attorney's malpractice. No part of the judgment had been paid and no execution thereof had been attempted. The jury awarded $40,000 in compensatory damages and the Court of Civil Appeals reversed. Reversing the Court of Civil Appeals, the Supreme Court said that under the "judgment rule," the existing judgment was evidence of actual damage and, therefore, the Court of Civil Appeals erred in holding there was no evidence to support the jury verdict. Similarly, the Supreme Court of Iowa, in *Pickens, Barnes & Abernathy v. Heasley*, 328 N.W.2d 524 (Iowa 1983), applied the "judgment rule" when the alleged malpractice is in negligently defending a case, which we find is analogous to the facts in the present case. The Iowa court said:

> The loss "actually sustained" from the adverse judgment in the prior case is the amount of that judgment including costs. 7 Am.Jur.2d *Attorneys-at-Law*, Sec. 226, at 270 (1980) ("Where an attorney is engaged to defend an action that is lost by his negligence, the amount of the judgment suffered by the client is a proper element of recovery in a malpractice proceeding against the attorney."); Annot., 45 A.L.R. 2d 62, 67 (1956).

*Id.* at 526.

Virginia has taken a contrary position. In *Allied Productions, Inc. v. Duesterdick*, 217 Va. 763, 232 S.E.2d 774 (1977), the Court held that when a client has suffered a judgment for money damages as the proximate result of his lawyer's negligence, such judgment constitutes actual damages recoverable in a suit for legal malpractice *only* to the extent such judgment has been paid. The majority of the Court found such cases analogous to cases involving contribution among joint tort-feasors, citing to cases holding that

a right of contribution arises only when one tort-feasor has paid or settled a claim for which other wrongdoers are also liable. In a well-reasoned dissent, however, Justice Poff observed:

> If the client has no cause of action until he has paid the judgment against him, then the larger the judgment, the greater the client's burden and the lawyer's impunity; the greater the injury wrongfully inflicted, the less the liability of the wrongdoer. The rule would seem to penalize a lawyer for his negligence when it costs his client a modest judgment but grant him immunity when his negligence results in a judgment too large for the client to pay. Furthermore, when the judgment forces the client into a state of insolvency, the rule may prejudice not only the client but his general creditors as well. Finally, the rule the majority adopt will force the client to choose whether to postpone suit against his negligent lawyer until he has paid his judgment-creditor in full or to institute a separate suit against his lawyer for each partial payment he makes. How the latter course might be affected by the doctrine of *res judicata* one can only wonder.

*Id.* 232 S.E.2d at 777.

Not mentioned by Justice Poff, but an equally vexatious problem if the "prepayment rule" were adopted, is the question of when the statute of limitations would begin to run. In this respect, at least, we have some guidance from our own Court of Appeals. In *Leonhart v. Atkinson,* 265 Md. 219, 289 A.2d 1 (1972), and in *Feldman v. Granger,* 255 Md. 288, 257 A.2d 421 (1969), professional malpractice actions against accountants for damages arising out of tax matters, the Court said the cause of action accrues when a deficiency assessment is received as that is when the wrong is discovered. Of particular significance is that, in both of those cases, the Court relied heavily on *Atkins v. Crosland,* 417 S.W.2d 150 (Tex.1967), the same case relied upon by the Texas Court in *Hernandez v. Great American Insurance Co. of N.Y., supra,* in choosing the "judgment rule" over

the "prepayment rule" in tort cases. While the time when the cause of action accrues is not necessarily the same as when the damages are fixed, in applying the "prepayment rule," the Virginia Court held the complaint did not state a cause of action because the judgment had not been paid, that is, that no cause of action accrued. We think this is at variance with the Maryland cases above cited.

We have been referred to no Maryland case, and our own research has disclosed none, specifically addressing the "judgment rule" versus the "prepayment rule" in the context of legal malpractice cases.[3] The Court of Appeals has addressed it, however, in the context of alleged negligent and bad faith refusal to settle a claim against an insured. In *Sweeten, Adm'r. v. Nat'l. Mutual*, 233 Md. 52, 56, 194 A.2d 817, 818 (1963), the issue before the Court was "whether the existence of an unpaid judgment will suffice to show injury and damage in the legal sense."

In adopting the view that payment is not a requisite to recovery, the Court rejected the appellee's contention that the "essence of the legal injury is pecuniary loss to the plaintiff," stating:

> Before payment the mere existence of an unsatisfied judgment may cause legal injury by loss or impairment of credit, and inability to obtain or retain an automobile operator's license.... We are constrained to follow what we think is the great weight of authority at this time, in a question not previously decided in this State.

*Sweeten, supra*, 233 Md. at 57, 194 A.2d at 819.

The Court went on to hold that the trial court should have overruled defendant's demurrer which was based on the contention that "the declaration did not allege that the administrator ever paid, was able to pay, or was ever requested to pay, any part of the prior judgment, and that in the absence of any allegation of pecuniary damage, the

---

3. The "discovery rule" was applied to the limitations question in *Mumford v. Staton, Whaley & Price*, 254 Md. 697, 255 A.2d 359 (1969), a case of alleged legal malpractice.

declaration did not state a cause of action." *Id.* at 54, 194 A.2d at 818.

■ The reasoning of the Court in *Sweeten* is equally applicable to professional malpractice cases. Suits for negligent and bad faith refusal to settle have many similarities to suits against negligent attorneys. Both deal with breaches of fiduciary duty and both concern tort liability arising out of a contractual relationship. As to the cases from other jurisdictions, we find more persuasive those supporting the "judgment rule." We hold, therefore, that the trial court erred in applying the "prepayment rule" to the judgment in this case.

## II

There was no evidence upon which the jury could assess damages on Roebuck's third party claim for the liquor suppliers' judgments.

■ Roebuck's second assertion is that the trial court erred in removing from the jury's consideration the liquor suppliers' judgments as an element of her compensatory damage.

As stated previously, Roebuck had executed guarantees to the liquor suppliers prior to the time Steuart became a partner in Express Liquors. At trial, Roebuck presented evidence that in 1980, approximately one year after Steuart became a partner, Steuart suggested check-kiting as a means to obtain inventory for the business.

On appeal, Roebuck contends that "[a]t the initiation of the check-kiting scheme, Steuart had an obligation as attorney for Roebuck to advise her that she had a right to terminate her guarantees with the liquor suppliers," and that "[n]ot only did Steuart fail to advise her that she had the right to terminate these guarantees but, in addition, he caused her to incur liability by advising Express to buy liquor with money it did not have."

Roebuck contends 1) that the court erred "when it stated that Roebuck did not prove what she would have done in the event that Steuart had advised her of her right to terminate the revocable guarantees," and 2) that the court erred in ruling that Roebuck failed to establish "what her liability would have been had she terminated the guarantees."

With regard to the first issue, Roebuck advances a reasonableness test, stating: "the issue is not what she would have done, but what a reasonable person would have done under the circumstances." Steuart contends, however, that a subjective test is applicable in legal malpractice cases, with the "burden on the plaintiff/client to produce evidence that he either 'acted or chose not to act in reliance upon' the attorney's omissions." Because we find that Roebuck failed to establish any damages, we need not address the applicable standard as to this issue. (That question will be discussed in connection with part C(2) of the cross appeal.)

The liquor suppliers' judgments against Roebuck were in the amount of $40,921.94. Roebuck contends that had Steuart properly informed her of the status of the business she would have terminated her guarantees and would have been liable only for the difference between the amount of Express Liquors' debts to the suppliers at the time of the hypothetical termination and the $40,921.94 in judgments entered against her. Assuming the validity of that position, this claim must fail because, as the trial judge found in granting Steuart's motion, there was no evidence from which the jury could determine the difference in those figures. The debt at the time of the hypothetical termination very well could have been equal to the amount of the judgments against her. Roebuck's evidence on that issue was pure speculation. She relied solely upon the testimony of Oliverio for determining the amount of debt outstanding at the time the check-kiting scheme began. That testimony was:

Q. How much money are we talking about or were you talking about at that time?

A. I can't remember, sir.

Q. Okay. Was it thousands of dollars, tens of thousands, hundreds?

A. Well, I'm sure it was several thousand. Yeah.

The "several thousand" dollars mentioned by Oliverio was not the full amount of the indebtedness. It was an amount necessary to bring the accounts within two weeks of being current, so as to avoid being placed on a "cash on delivery" status by the suppliers. Oliverio testified that the total indebtedness at any given time may have been as much as $40,000 to $45,000.

We find the evidence to be totally devoid of any reasonable certainty. One may recover only those damages that are affirmatively proved with reasonable certainty, and said damages may not be based on speculation or conjecture. *Empire Realty Co. v. Fleisher*, 269 Md. 278, 305 A.2d 144 (1973); *Asibem Assoc., LTD. v. Rill*, 264 Md. 272, 286 A.2d 160 (1972).

### III

There was no evidence to support an award of punitive damages, attorney's fees, or for mental anguish.

### Punitive Damages

An action for professional malpractice against an attorney alleges the negligent breach of a contractual duty. *Mumford v. Staton, Whaley & Price*, 254 Md. 697, 255 A.2d 359 (1969). In a tort action arising out of a contractual relationship, actual malice is a prerequisite to the recovery of punitive damages. *H & R Block, Inc. v. Testerman*, 275 Md. 36, 338 A.2d 48 (1975); *New Summit Associates v. Nistle*, 73 Md.App. 351, 533 A.2d 1350 (1987). Actual malice is the "performance of an unlawful act, intentionally or wantonly, without legal justification or excuse but with an evil or rancorous motive influenced by hate; the purpose being to deliberately and wilfully injure the plaintiff." *Drug Fair v. Smith*, 263 Md. 341, 352, 283 A.2d 392, 398

(1971); *see also, H & R Block, supra.* We agree with the trial court that there was no evidence of actual malice.

The cases relied upon by appellant are inapposite. *General Motors Corp. v. Piskor,* 277 Md. 165, 352 A.2d 810 (1976), was a defamation case. Such cases have their own peculiar standards governing the presence or absence of malice which need not be discussed here. *Finch v. Hughes Aircraft Co.,* 57 Md.App. 190, 469 A.2d 867, *cert. denied,* 300 Md. 88, 475 A.2d 1200 (1984), *cert. denied,* 469 U.S. 1215, 105 S.Ct. 1190, 84 L.Ed.2d 336 (1985), and *Thomassen Lincoln–Merc. v. Goldbaum,* 45 Md.App. 297, 413 A.2d 218, *cert. denied,* 288 Md. 744 (1980), were actions based on fraud and deceit, which were neither alleged nor proven in this case.

### Attorney's Fees

Appellant acknowledges in her brief that, in the context of this case, "the facts necessary to support a claim for attorney's fees are essentially the same as those necessary to recover punitive damages." As we have found no evidence to support an award of punitive damages, the claim for attorney's fees necessarily fails.

### Mental Anguish

The evidence of Roebuck's "mental anguish" consisted solely of her testimony that:

> I went to see Dr. Rendler who is a psychologist I had seen once before a couple years after I moved in with my mother and realized there was nothing left and John was falling apart. There was no house. I went to see him about six times.

Clearly this evidence is inadequate to show "some clearly apparent and substantial physical injury, as manifested by an external condition or by symptoms clearly indicative of a resultant pathological, physiological, or mental state." *New Summit Associates, supra,* 73 Md.App. at 361–62, 533 A.2d at 1355. The psychologist did not testify and Roebuck did not testify as to any symptoms, counseling or treatment.

This evidence did not even mount up to a "feigned claim." *See H & R Block, supra,* 275 Md. at 48, 338 A.2d at 55.

The issues of punitive damages, attorney's fees and mental anguish properly were withdrawn from the jury.

### The Cross Appeal

### A

Roebuck's claim based on the Suburban Bank judgment was not barred by *res judicata.*

In the bankruptcy proceedings of Express Liquors, Inc., debtor, the Trustee, Michael J. Schwarz, instituted an action to recover from Equitable Bank and Suburban Bank payments received by those banks arising from the sale of Express Liquors to Jin–Mar, Inc. et al. Suburban filed a third party complaint against the Steuarts, Oliverio and Roebuck, based upon their guarantees of the debts to Suburban allegedly paid by preferential payments. Roebuck filed cross-claims against the other third party defendants and the buyers, seeking indemnification "in an amount equal to the amount, if any, which third party plaintiff, Suburban Bank, may recover against her." Roebuck's cross-claim against Steuart, filed on 29 April 1985, was based upon an accommodation theory—that she executed her personal guarantee on behalf of Express Liquors and for the benefit of its principals. Steuart was a principal in the business at the time of Roebuck's guarantee to Suburban.

On 17 October 1986, Bankruptcy Judge A. Thomas Small entered judgment in favor of Suburban in its third party complaint against Oliverio and Roebuck in the amount of the avoided payments, $60,238.85. Judgment was entered for the Steuarts on Suburban's third party complaint against them. Judge Small also held that

> Mrs. Roebuck did not pursue her crossclaims against the Buyers and the other third party defendants and those crossclaims will be dismissed.

Steuart asserts that Roebuck's claim in this case based on the Suburban judgment against her is barred by the doc-

trine of *res judicata.* He contends that "[t]he prior dismissal of this identical claim by the Bankruptcy Court acts as a bar to Roebuck's attempt to resurrect it." We disagree.

A final judgment of a court having jurisdiction of the parties and the subject matter in a case where an issue has been decided on the merits cannot be later controverted by the same parties in the same or any other tribunal. If there is an identity of parties, *an identity of subject matter, jurisdiction over both* and *a final decision on the merits,* there arises the classic situation for the application of the doctrine of res judicata.... The doctrine as stated above applies without regard to the kind of court which rendered the earlier final judgment. [emphasis supplied]

*DeMaio v. Lumbermens Mutual,* 247 Md. 30, 33–34, 230 A.2d 279, 281 (1967).

In our view, the dismissal of Roebuck's cross-claim against Steuart by the bankruptcy judge was not a final judgment on the merits by a court having jurisdiction to do so. Under 28 U.S.C.S., § 157, where a claim involves no issues of bankruptcy law, does not directly or indirectly involve the debtor or his property, and a decision on the merits of such claim would have no effect on any aspect of the bankruptcy proceeding, the claim is a *non-core, unrelated* proceeding over which the bankruptcy court has no jurisdiction. *Allis–Chalmers Corp. v. Borg–Warner Acceptance Corp. (In re Dr. C. Huff Co., Inc.),* 44 B.R. 129 (Bankr.W.D.Ky.1984). *See also First National Bank of Geneva v. Biallas (In re Denalco Corp.),* 57 B.R. 392 (N.D.Ill.1986); *New Farmers National Bank of Glasgow v. McKinney (In re D.L. McKinney),* 45 B.R. 790 (Bankr. W.D.Ky.1985). Furthermore, it has been held that bankruptcy courts lack jurisdiction to hear claims for legal malpractice and breach of fiduciary duty based solely on state law and which do not affect the administration of the bankruptcy estate. *Fisher, Hecht & Fisher v. D.H. Over-*

*myer Telecasting Co., Inc.* (*In re D.H. Overmyer Telecasting* ), 47 B.R. 823 (Bankr. N.D.Ohio 1985).

The bankruptcy judge found that:

> The trustee's causes of action are core proceedings pursuant to 28 U.S.C. § 157(b)(2)(E),(F),(H), and (O). The court also considers the related cross-claims and the counterclaims to be core proceedings as well since those causes of action have many overlapping factual issues, are closely related to the claims brought by the trustee, and are directly affected by the outcome of the trustee's proceeding.

28 U.S.C.S. § 157(b)(2) (1986, 1987 Cum.Supp.) identifies as core proceedings, among other things; (E) orders to turn over property to the estate; (F) proceedings to determine, avoid, or recover preferences; (H) proceedings to determine, avoid, or recover fraudulent conveyances; and (O) other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor or the equity security holder relationship, except personal injury tort or wrongful death claims. The trustee's causes of action against the banks were appropriately within one or more of those definitions. The bankruptcy judge specifically did not find Roebuck's cross-claim against Steuart to be within any of those categories.

> "Claims (whether state-law or not) by the debtor against a non-creditor do not appear in the list of 'core proceedings' given in § 157(b)(2). True, § 157(b)(2) expressly states the list given is illustrative and not exhaustive, but because the list given is extensive, specifically includes one kind of claim made by debtors (namely, counterclaims against creditors; see § 157(b)(2)(C)), and because claims against non-creditors are an important category of cases very much on Congress's mind when the 1984 Act was passed (see *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.,* 458 U.S. 50 [102 S.Ct. 2858, 73 L.Ed.2d 598] (1982)), this court concludes that if Congress had wanted this kind of case to be considered a core proceeding it would have included it in the given list.

*UNR Industries, Inc. v. Continental Ins. Co.,* 623 F.Supp. 1319, 1332 (D.C.Ill.1985). We think the same analysis can be made of the cross-claim in this case.

> (c)(1) A bankruptcy judge may hear a proceeding that is not a core proceeding but that is otherwise related to a case under title 11 [11 USCS §§ 101 et seq.]. In such proceeding, the bankruptcy judge shall submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing de novo those matters to which any party has timely and specifically objected.
>
> (2) Notwithstanding the provisions of paragraph (1) of this subsection, the district court, with the consent of all the parties to the proceeding, may refer a proceeding related to a case under title 11 [11 USCS §§ 101 et seq.] to a bankruptcy judge to hear and determine and to enter appropriate orders and judgments, subject to review under section 158 of this title (28 USCS § 158].

28 U.S.C.S. § 157. *See also Rosen–Novak Auto Co. v. Honz,* 783 F.2d 739, 742 (8th Cir.1986).

 The test for determining whether a civil proceeding is related to a bankruptcy proceeding under 28 U.S.C.S. § 157 is "whether the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy." *In re Dickenson Lines, Inc.,* 47 B.R. 653, 656 (Bankr. D.Minn.1985). Roebuck's cross-claim against Steuart, while perhaps related to the trustee's claim against the bank, did not in any way affect any claim by or against the bankrupt corporation. Neither the bankrupt debtor nor any of its creditors would receive any more or any less funds as a result of the litigation between Roebuck and Steuart. As to this claim, neither Roebuck nor Steuart was either a debtor or a creditor of Express Liquors, Inc. This cross-claim, therefore, was neither a "core proceeding" nor a "related proceeding" within the meaning of § 157 and was beyond the jurisdiction of the bankruptcy court. There

being no final judgment on the merits by a court with jurisdiction to enter such judgment, *res judicata* does not apply.

## B

Roebuck's claims as to the Suburban Bank judgment and the loss of the proceeds from the sale of her home were properly joined with her third party claim.

■■■ Citing Rule 2–332(a), Steuart asserts that Roebuck's claims as to the Suburban judgment and the loss of funds from the sale of the house were not proper third party claims.[4] We agree that a proper third party claim must be based upon the plaintiff's claim against the original defendant. *Aetna Casualty v. Hartford Accident*, 74 Md. App. 539, 539 A.2d 239 (1988). We agree further that only the claims of the liquor suppliers against Roebuck, asserted in the first count of her cross-claim, were appropriate "third party claims." We are aware of no provisions in the Rules, however, which prohibit the joinder of other claims in other counts. While Rule 2–303(c) and Rule 2–503(a)(1) are not made *specifically* applicable to third party claims, we are aware of no reason or logic why related claims should not be joined with a third party claim.

Rule 2–303(c) provides, in pertinent part:

... A party may also state as many separate claims or defenses as the party has, regardless of consistency and whether based on legal or equitable grounds.

Rule 2–503(a)(1) provides, among other things:

When actions involve a common question of law or fact or a common subject matter, the court, on motion or on

---

4. Rule 2–332(a) states:

A defendant, as a third-party plaintiff, may cause a summons and complaint, together with a copy of all pleadings and motions previously filed in the action, to be served upon a person not previously a party to the action **who is or may be liable to the defendant for all or part of a plaintiff's claim against the defendant.** A person so served becomes a third-party defendant. [emphasis added]

its own initiative, may order a joint hearing or trial or consolidation of any or all of the claims, issues, or actions....

Count I in Roebuck's third party complaint (the true third party claim) sought indemnification from Steuart on the basis that his alleged malpractice caused Roebuck to be liable on those claims. Counts II and III, while not part of the original plaintiffs' claims against Roebuck, also alleged Steuart's malpractice as the basis of his liability on those other claims. All of those claims involved common questions of law or fact and common subject matter. Steuart concedes as much. In his argument that Roebuck's claim as to the Suburban Bank judgment is barred by *res judicata*, Steuart asserted:

> The "complex of related facts" supporting all of Roebuck's claims against Steuart is precisely the same. All of her claims were precipitated by the financial failure and ultimate bankruptcy of Express Liquors and all of her damages arise from that occurrence.... In every instance she is claiming that their respective interests were in conflict and that Steuart acted to further his own interests to the detriment of hers.

Steuart concedes further that such joinder would be permissible under Fed.Rule of Civil Procedure 18.[5] He insists, however, that because there is no Maryland Rule specifically stating that such joinder is permitted, this necessarily means such joinder is not permitted.

The objective of the Maryland Rules, as is the case with the Federal Rules, is to facilitate the attainment of a just, speedy and inexpensive determination of all disputes between the same parties. *Robertson v. Davis*, 271 Md. 708, 319 A.2d 816 (1974). We perceive no abuse of the trial

---

**5.** Fed.R.Civ.P. 18 provides, in pertinent part:
(a) Joinder of Claims. A party asserting a claim to relief as an original claim, counterclaim, cross-claim, or third-party claim, may join, either as independent or as alternate claims, as many claims, legal, equitable, or maritime, as he has against an opposing party.

court's discretion in permitting the joinder of these claims, particularly since the original "third party claim" was removed from the jury's consideration, thus avoiding any possible confusion or prejudice. *See* Rule 2–503(b).

## C

The evidence was sufficient to support the findings of the jury (1) that Roebuck's investment of the $22,379.36 was in reliance on Steuart's statements or omissions, and (2) that Steuart's conduct was the proximate cause of the Suburban Bank judgment against Roebuck.

As we have observed previously, special issues were submitted to the jury. By its affirmative answers to those issues, the jury found in substance:

1. Steuart acted as Roebuck's attorney in her decision to apply the proceeds from the sale of her home to the debts of Express Liquors, Inc.

2. Steuart failed to exercise reasonable care and skill in that representation.

3. Roebuck's decision to apply those proceeds to the business debts was caused by Steuart's failure to exercise reasonable care and skill.

4. There was an attorney/client relationship between Steuart and Roebuck at the time of the sale of Express Liquors to Jin–Mar.

5. Steuart failed to exercise reasonable care and skill in connection with Roebuck's participation in securing financing from Suburban for the purchase of the business by Jin–Mar.

6. Roebuck would have agreed to join as an additional guarantor on the second Suburban note had she been given the opportunity.

7. As a result of 4, 5, and 6, Roebuck incurred damages of $60,000.

For the purposes of this part of his argument, Steuart asserts there was no evidence to support the verdict of the

jury as to issues 3 and 6, and that the trial court should have granted his motion for judgment on those issues.

In considering a motion for a directed verdict the trial court assumes the truth of all credible evidence on the issue and of all inferences fairly deducible therefrom. It then considers them in the light most favorable to the party against whom the motion is made. If there is any legally relevant and competent evidence, however slight, from which a rational mind could infer a fact in issue, then a trial court would be invading the province of the jury by directing a verdict. In such circumstances, the case should be submitted to the jury and a motion for a directed verdict denied. [citations omitted]

*General Motors Corp. v. Lahocki*, 286 Md. 714, 733, 410 A.2d 1039, 1049 (1980); *see also* Rule 2-519(b).

(1)

With respect to the jury award of $22,379.36, representing Roebuck's share of the proceeds from the sale of her home which she invested in Express Liquors, there was evidence presented that Roebuck's decision to apply the sale proceeds to the business was made in reliance upon Steuart's advice.

Roebuck testified that after Oliverio informed her of the check-kiting scheme and his desire to have the proceeds from the sale of their home applied to the business debt, she replied:

I said if the thirty-five thousand dollars will take care of this problem and we will still have a business—we'll have no home, but if we will still have a business and everything then I will consider applying the proceeds. You know, I will apply the proceeds if this will take care of the problem and it will keep you from going to prison. And I went upstairs and I called Cal Steuart

. . . .

Roebuck testified that she met with Steuart the following morning and expressed to him her concern about the entire situation.

I told Cal [Steuart] that I understand the check kiting to be or floating to be thirty-five thousand dollars. I wanted to know why. I wanted him to explain it to me as I had asked John [Oliverio] the night before; why it took place, why it happened. I wanted to know in his opinion would they really come and arrest John. I wanted to know if I turn this money over which meant John and I had nothing left to our name, but there would be a business left. There would be something that we could work in. And that John had agreed to turn over half of his stock to me and would Cal draw up an agreement so that I would become half owner in the business so that I could work in it, at least keep tabs on what was going on since it would be the only thing left.

She also demanded to know how the debt arose.

Mr. Steuart told me that the reason that they had to start floating money was because the business was short of cash, that John had come to him for money. He didn't have any more cash to invest and that—that's how the floating got started. But, that thirty-five thousand dollars would take care of the problem and that he didn't have any money—more money to put into the business. He also thought it was a great idea that he and I would become business partners.

Roebuck further testified that Steuart drafted an agreement regarding the application of the proceeds to the business, that he reviewed it with her, that she and Oliverio signed the agreement and that she applied her half of the proceeds to the business debt. We conclude that the evidence sufficiently established facts from which the jury could find reasonable inferences that Roebuck would not have applied the proceeds to the business had she been properly informed of the business's status and that Steuart's advice was the proximate cause of this loss.

(2)

Finally, Steuart argues "there was no evidence presented at trial that Steuart's conduct was the proximate cause of

Roebuck suffering a judgment to Suburban." Specifically, he asserts there was no evidence to support the verdict of the jury on issue 6, that Roebuck would have joined in the execution of the second Suburban note had she been given the opportunity, and further, that there was no evidence that Suburban would have accepted her on that note—an issue not presented to the jury. On the other hand, Roebuck asserts that it was not necessary "to present proof of what *she* would have done had Steuart fully informed her of the true situation" or "whether Suburban would have accepted her." Rather, she contends that an objective standard is applied to such controversies—with the relevant inquiry being: was there evidence from which a jury could determine what a reasonable person would have done under the circumstances? She posits that the causality issue here is governed by the same standards articulated by the Court of Appeals in *Sard v. Hardy*, 281 Md. 432, 379 A.2d 1014 (1977), discussing the doctrine of informed consent in medical malpractice cases. There, the Court said:

> [T]hat the causality requirement in cases applying the doctrine of informed consent is to be resolved by an objective test: whether a reasonable person in the patient's position would have withheld consent to the surgery or therapy had all material risks been disclosed.... Under this rule, the patient's hindsight testimony as to what he would have hypothetically done, though relevant, is not determinative of the issue.

*Id.* at 450, 379 A.2d at 1025.

While perhaps not precisely so, we think the analogy is appropriate. Under the doctrine of informed consent in medical malpractice cases, it is the fiduciary relationship between the doctor and the patient which imposes upon the doctor an obligation to disclose to the patient all material facts necessary to an informed intelligent decision. *Sard v. Hardy*, 34 Md.App. 217, 247, 367 A.2d 525, 542 (1976) (Davidson, J., dissenting) (*rev'd on other grounds*, 281 Md. 432, 379 A.2d 1014 (1977)). The duty is one imposed by law in the same manner as imposed upon others in a similar

fiduciary relationship. *Cooper v. Roberts*, 220 Pa.Super 260, 286 A.2d 647 (1971). That same fiduciary relationship exists between a lawyer and his client. As we have observed previously, the jury found that Steuart was Roebuck's attorney at the time of the purchase of Express Liquors by Jin–Mar, and that he failed to exercise reasonable care in his representation of her in connection with Roebuck's participation in securing financing from Suburban for that purchase. Both Steuart and Roebuck had been guarantors on the debt to Suburban. Steuart, at that time, was also an owner of Express Liquors. In negotiating the sale, without the knowledge or participation of Roebuck, Steuart took action which resulted in his release from their joint obligation while leaving his client responsible therefor. Roebuck presented expert testimony that Steuart, as a "careful" and "competent" lawyer, should have foreseen those consequences. He cannot, while representing both himself and his client, secure a benefit to himself not secured for his client. To hold otherwise would be

to overlook the age-old principle applicable to fiduciary relationships that, unless there is a full disclosure by the agent, trustee, or attorney of his activity and interest in the transaction to the party he represents and the obtaining of the consent of the party represented, the party serving in the fiduciary capacity cannot receive any profit or emolument from the transaction. This is true even when the transaction benefits the principal or client, which does not readily appear to be the case in this transaction.

*McGinnis v. Rogers*, 262 Md. 710, 732, 279 A.2d 459, 470 (1971).

█ Viewed in the light most favorable to Roebuck, the evidence supported findings by the jury that Steuart knew or should have known that Roebuck's guarantee on the new note to Suburban would have secured her release as guarantor of the previous notes. As her attorney, he should have so advised her. The jury could, and apparently did, infer that a reasonable person in possession of that advice

would have elected to join in the new guarantee. As the bank previously had accepted both Steuart and Roebuck as guarantors of Express Liquors, the jury could infer that a reasonable bank would accept both as guarantors of Jin-Mar. The reasonable inference from all the evidence was that Steuart's conflict of interest was a proximate cause of the $60,000 judgment against Roebuck.

THE ORDER OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY MAKING APPELLANT AND CROSS APPELLEE'S $60,000 JUDGMENT CONTINGENT UPON HER PAYMENT OF THAT AMOUNT TO SUBURBAN BANK IS VACATED, AND THE CASE REMANDED TO THE CIRCUIT COURT WITH DIRECTIONS TO ENTER JUDGMENT ON THE VERDICT OF THE JURY; IN ALL OTHER RESPECTS, JUDGMENTS AFFIRMED; COSTS TO BE PAID ONE-THIRD BY APPELLANT–CROSS APPELLEE ROEBUCK, AND TWO-THIRDS BY APPELLEE–CROSS APPELLANT STEUART.