587 A.2d 491

**Amelia R. SCHAEFER**

v.

**Gerald A. MILLER.**

**No. 112, Sept. Term, 1989.**

Court of Appeals of Maryland.

March 26, 1991.

Motion for Reconsideration Denied May 6, 1991.

298

Amy J. Muffolett and Patrick A. O'Doherty, Baltimore, for petitioner.

Melvin J. Sykes, Baltimore, for respondent.

Argued before MURPHY, C.J., ELDRIDGE, RODOWSKY, McAULIFFE, and CHASANOW, JJ., and COLE* and ADKINS**, JJ. (Retired).

MURPHY, C.J., announcing the judgment of the Court, in an opinion in which RODOWSKY and McAULIFFE, JJ., join; ELDRIDGE, J., concurs in the judgment in an opinion in which COLE and CHASANOW, JJ., join.

This case concerns punitive damages in a medical malpractice action. It focuses on our holding in *H & R Block Inc. v. Testerman*, 275 Md. 36, 338 A.2d 48 (1975), that "where the tort is one arising out of a contractual relationship, actual malice is a prerequisite to the recovery of punitive damages." *Id.* at 47, 338 A.2d 48.

## I.

■ It is well settled law in Maryland, and the general rule elsewhere, that punitive damages are prohibited in a pure action for breach of contract. *Miller Building Supply v. Rosen*, 305 Md. 341, 348, 503 A.2d 1344 (1986); *Siegman v. Equitable Trust Co.*, 267 Md. 309, 313, 297 A.2d 758 (1972); *St. Paul at Chase v. Mfrs. Life Insur.*, 262

---

* Cole, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

** Adkins, J., now retired, participated in the hearing and conference of this case while an active member of this Court but did not participate in the decision and adoption of this opinion.

Md. 192, 236, 278 A.2d 12, *cert. denied,* 404 U.S. 857, 92 S.Ct. 104, 30 L.Ed.2d 98 (1971); Restatement (Second) of Contracts § 355 (1979); 5 *Corbin on Contracts* § 1077 (1964).

"In a tort case where punitive damages are permitted, in order to obtain such an award a plaintiff must prove actual malice or its legal equivalent." *Siegman v. Equitable Trust Co., supra,* 267 Md. at 313–14, 297 A.2d 758 (footnote omitted); *see also D.C. Transit System v. Brooks,* 264 Md. 578, 583–84, 287 A.2d 251 (1972); *Daugherty v. Kessler,* 264 Md. 281, 284, 286 A.2d 95 (1972); *Associates Discount v. Hillary,* 262 Md. 570, 581–82, 278 A.2d 592 (1971); *St. Paul at Chase v. Mfrs. Life Insur., supra,* 262 Md. at 237, 278 A.2d 12; *Damazo v. Wahby,* 259 Md. 627, 638, 270 A.2d 814 (1970). "Actual or express malice ... has been characterized as the performance of an act without legal justification or excuse, but with an evil or rancorous motive influenced by hate, the purpose being to deliberately and willfully injure the plaintiff." *Testerman, supra,* 275 Md. at 43, 338 A.2d 48; *Miller Building Supply v. Rosen, supra,* 305 Md. at 347, 503 A.2d 1344; *Henderson v. Maryland Nat'l Bank,* 278 Md. 514, 519, 366 A.2d 1 (1976); *Siegman v. Equitable Trust Co., supra,* 267 Md. at 314, 297 A.2d 758; *Drug Fair v. Smith,* 263 Md. 341, 352, 283 A.2d 392 (1971).

Implied or legal malice "may be defined as conduct of an extraordinary nature characterized by a wanton or reckless disregard for the rights of others." *Wedeman v. City Chevrolet Co.,* 278 Md. 524, 532, 366 A.2d 7 (1976); *see also General Motors Corp. v. Piskor,* 281 Md. 627, 634, 381 A.2d 16 (1977); *St. Paul at Chase v. Mfrs. Life Insur., supra,* 262 Md. at 238–39, 278 A.2d 12.

As we stated in *Testerman,* the landmark case regarding punitive damages in actions arising out of contractual relationships is *Knickerbocker Co. v. Gardiner Co.,* 107 Md. 556, 69 A. 405 (1908). In that case, the defendant caused a third party to break its contract with the plaintiff. There, we said that "if, for example, there was evidence tending to show that the defendant has caused the contract to be broken for the sole purpose, and with the deliberate intention of wrongfully injuring the plaintiff, exemplary dam-

ages might be recovered." *Id.* at 569, 69 A. 405 (emphasis added). Consistent application of this rule foreshadowed the rule announced in *Testerman. See, e.g., Siegman v. Equitable Trust Co., supra,* 267 Md. at 314, 297 A.2d 758 (conversion of checking account funds); *Daugherty v. Kessler,* 264 Md. 281, 284, 286 A.2d 95 (1972) (tortious inducement to breach contract); *St. Paul at Chase v. Mfrs. Life Insur., supra,* 262 Md. at 238, 278 A.2d 12 (breach of contract; negligent performance of contractual obligation); *Damazo v. Wahby, supra,* 259 Md. at 639, 270 A.2d 814 (tortious inducement to breach contract).

■ In light of *Knickerbocker* and its progeny there appear to be only two cases in which punitive damages have been permitted for torts arising out of contracts: *Rinaldi v. Tana,* 252 Md. 544, 250 A.2d 533 (1969) (tortious interference with contract) and *McLung–Logan v. Thomas,* 226 Md. 136, 172 A.2d 494 (1961) (trover and conversion). In both of these cases actual malice was established. In *Rinaldi* there was evidence of express animosity, and in *McLung–Logan* there was evidence of an evil and spiteful motive.

In *Testerman,* the plaintiffs claimed negligent preparation of their tax returns. We held that "where the tort is one arising out of a contractual relationship, actual malice is a prerequisite to the recovery of punitive damages." 275 Md. at 47, 338 A.2d 48. We there explicitly declined to extend the implied malice rule to torts arising out of contracts, *id.,* and we have followed the *Testerman* rule on a number of occasions. *See, e.g., Rite Aid Corp. v. Lake Shore Investors,* 298 Md. 611, 471 A.2d 735 (1984) (slander of title); *General Motors Corp. v. Piskor, supra,* (false imprisonment and assault); *Wedeman v. City Chevrolet, supra,* (deceit); *Henderson v. Maryland Nat'l Bank, supra,* (conversion); *Food Fair Stores v. Hevey,* 275 Md. 50, 338 A.2d 43 (1975) (conversion).

## II.

In 1973, Amelia R. Schaefer began seeing Gerald A. Miller, M.D., a board certified ophthalmologist, for annual eye examinations. In 1982, when Schaefer was 72 years

old, Miller determined that she was developing a cataract in her right eye. A new prescription for stronger lenses improved Schaefer's vision, and she was satisfied with the glasses.

At her next annual eye examination, in July 1983, Miller advised Schaefer that the cataract was ready to be removed. Viewing the evidence in a light most favorable to Schaefer, Miller advised her that the cataract needed to be removed but he did not perform an examination of her eye at that time and did not test her vision. Miller, on the other hand, claimed to have performed an acuity test, a binocularity test, and a glaucoma test.

Schaefer agreed to have Miller perform a cataract operation at St. Agnes Hospital on an outpatient basis. Thereafter Miller removed the cataract and implanted an intraocular lens in Schaefer's eye.[1] The surgery went well and Schaefer went home that same day.

A few days after the surgery, Schaefer complained of pain in her eye. Miller determined that her eye was infected, and admitted her to the hospital. She was treated with antibiotics and Miller scheduled her for a vitrectomy (removal of pus from the eye). The vitrectomy revealed a significant amount of purulent material in Schaefer's eye. Schaefer remained in the hospital for two weeks, during which time she was on antibiotics, suffered pain, and was unable to see out of the affected eye.

During a subsequent office visit, on August 24, 1983, Miller again determined that Schaefer's eye was infected. On that occasion and two subsequent office visits, Miller treated Schaefer's eye with laser therapy to open a membrane that was blocking her vision. After the last treatment, he told her that she had 20/40 vision in her eye. Schaefer visited Miller's office one more time, when she

---

**1.** In his brief, Miller asserts that intraocular lens implants are a standard technique in treating cataracts, and that they were "used in 90% of the cases at the time of [Schaefer's] operation, and in 95–98% of the cases at the time of trial."

received a new prescription for eyeglasses. Schaefer thereafter sought opinions of other ophthalmologists, one of whom was Dr. Dennis A. Gleicher, who later testified as an expert witness for Schaefer.

Schaefer filed a medical malpractice claim against Miller, on October 1, 1984. A unanimous Health Claims Arbitration panel awarded Schaefer $1.00 in compensatory damages and $25,000 in punitive damages. Both parties rejected the award. Thereafter, Schaefer filed a complaint against Miller in the Circuit Court for Baltimore City. It contained two counts: (1) that Miller performed the surgery on Schaefer without informed consent and (2) that Miller failed to comport with the applicable standards of care in Schaefer's preoperative and postoperative treatment.

Before a jury, Dr. Gleicher testified that Miller failed to comply with the required standards of care for obtaining informed consent and treating Schaefer's post-operative infection which caused her chronic pain, retinal degeneration, decreased visual acuity and light sensitivity.

Schaefer testified that Miller did not describe the surgical procedure involved in cataract removal or the accompanying risks. Her only knowledge of cataract removal came from a portion of a television program which she had seen about two months prior to the examination. She said that she was only willing to have her cataract removed and was unaware of anything about an intraocular lens implant.

Called as an adverse witness by Schaefer, Miller produced an informed consent form purportedly signed by Schaefer for the cataract removal and the intraocular lens implantation. Schaefer disputed that she had signed the document and adduced evidence that on a previous occasion in 1978, Miller forged a patient's signature on an informed consent form for an intraocular lens implant. Subsequently, Miller admitted at the trial to having committed this act, and to rewriting some other records. He acknowledged that he was sanctioned in 1985 by the Commission on Medical Discipline which ordered that his license to practice medi-

cine be suspended unless, among other requirements, he include an informed consent form in each operative patient's chart, properly dated, signed by the patient, and witnessed by a third party.

The evidence showed that the consent form, which Miller claimed Schaefer signed, was signed by Miller in both the doctor and witness signature blanks. The time and place blanks were not completed. The consent form was not part of the St. Agnes Hospital records, but was produced by Miller when Schaefer requested her medical records.

The trial judge instructed the jury on the applicable standards for determining negligence *vel non.* He said:

"This case then is simply a claim of negligence by a patient against her doctor and as I indicated to you at the outset of the trial, the words medical malpractice should be of no concern to you and is simply a term often used to describe a negligence action against a health care provider. What we are concerned about is simply whether or not the defendant was negligent in any way with respect to the plaintiff."

The court also instructed the jury that it could award Schaefer punitive damages upon a finding that Miller acted with implied malice. It gave the following instruction:

"Punitive damages may only be awarded if you find that the defendant was not merely negligent, but acted with malice. That is, he acted so recklessly or outrageously as to indicate a wanton disregard for the rights, health or safety of the plaintiff or with a callous indifference to the consequences."

On June 16, 1988 the jury returned a verdict of $350,000 in compensatory damages and $750,000 in punitive damages. Schaefer consented to a remittitur of the compensatory damages from $350,000 to $50,000. On August 5, 1988 judgment was entered against Miller for $50,000 in compensatory damages and $750,000 in punitive damages.

Miller appealed to the Court of Special Appeals. He argued that the judgment for punitive damages should be

reversed because the tort committed by him arose out of a contractual relationship, and there was no evidence of actual malice. The Court of Special Appeals, in an opinion by Judge Karwacki, agreed and reversed the punitive damages award. *Miller v. Schaefer*, 80 Md.App. 60, 559 A.2d 813 (1989). Thereafter, we granted Schaefer's petition for a writ of certiorari.

## III.

In the Court of Special Appeals, Schaefer argued that Miller committed three distinct torts: fraud, battery and negligence. As to fraud, Schaefer contended that Miller fraudulently induced her to undergo the surgery when it was not necessary and, because the representation was false, no contractual relationship was created. As to the battery, Schaefer argued that by implanting an intraocular lens without any consent, Miller committed a battery upon her.

In its opinion, the intermediate appellate court pointed out that Schaefer's complaint did not contain any allegations of fraud or battery and that her action was based solely upon two theories of negligence, namely, that Miller performed the surgery without informed consent and that Miller failed to comport with the applicable standards of care in Schaefer's preoperative and postoperative treatment. 80 Md. App. at 72, 559 A.2d 813. It also pointed out that the jury instructions and the "issues as framed for the jury and approved by counsel on the special verdict sheet, were couched in terms of whether [Miller] conformed with the required standards of care in his treatment of [Schaefer]." [2]

---

2. The issues as framed on the special verdict sheet were as follows:
   "1. Did the defendant comply with the standards of care applicable to him in making an adequate disclosure of material facts to the plaintiff relative to the treatment which she underwent, and did she knowingly and intelligently agree to this procedure being done?
   "2. Did the defendant comply with the standards of care applicable to him in all of his pre-operative procedures and post operative care with respect to the plaintiff?

*Id.* at 73, 559 A.2d 813. The court concluded that because the torts of fraud and battery were not asserted at trial, they would not be addressed on appeal, citing Maryland Rule 8–131(a). Thus, the focus of the case before the intermediate appellate court was "whether the two counts of negligence actually litigated by Schaefer arose out of a contractual relationship." *Id.*

The Court of Special Appeals noted that the relationship between physician and patient is a consensual one arising out of an express or implied contract. *Id.* It reviewed the relevant authority regarding the relationship between physicians and patients and the nature of malpractice suits. Citing a number of Maryland cases, and analogizing medical and legal professional malpractice suits, the court determined that before a physician may be found liable for an act of medical malpractice, it is essential that a patient-physician relationship be in existence at the time the alleged act occurred. *Id.* The court relied in part upon *Hoover v. Williamson*, 236 Md. 250, 253, 203 A.2d 861 (1964), where we said

"that ordinarily recovery for malpractice or negligence against a doctor is allowed only where there is a relationship of doctor and patient as a result of a contract, express or implied, that the doctor will treat the patient with professional skill and the patient will pay for such treatment, and there has been a breach of professional

"3. If your answer to issue 1 or 2 is 'no', do you find that any such breach of standard of care by the defendant was the proximate cause of any injury, loss or damage to the plaintiff?

"4. If your answer to issue 3 is 'yes', in what amount do you award compensatory damages to the plaintiff?

"5. If you have awarded compensatory damages to the plaintiff, you may but are not required to award to the plaintiff punitive damages as well. Punitive damages may only be awarded if you find that the defendant was not merely negligent but acted with malice, that is he acted so recklessly or outrageously as to indicate a wanton disregard for the rights, health or safety of the plaintiff, or a callous indifference to the consequences. If you do award punitive damages, in what amount do you award them?"

duty to the patient." [3]

The court concluded that a contractual relationship arose in this case when Schaefer accepted Miller's diagnosis that the cataract in her right eye had to be removed. *Id.*, 80 Md.App. at 75, 559 A.2d 813. It reasoned that "[b]ased on this consensual agreement, certain obligations were created, including [Miller's] duty to inform [Schaefer] of the procedure to be used and the risks involved as well as his duty to treat her properly." *Id.* (citing *Roebuck v. Steuart*, 76 Md.App. 298, 325, 544 A.2d 808 (1988); *Miller v. Kennedy*, 11 Wash.App. 272, 522 P.2d 852, 860 (1974), *aff'd per curiam*, 85 Wash.2d 151, 530 P.2d 334 (1975); *Woods v. Brumlop*, 71 N.M. 221, 377 P.2d 520, 524 (1962)).

The court considered but found no merit in Schaefer's contention that because her consent was not informed as to the particular type of cataract operation performed, there was no contract out of which the tort arose and thus the *Testerman* punitive damage rule did not apply. Citing *Sard v. Hardy*, 281 Md. 432, 379 A.2d 1014 (1977), the court said that a claim under the informed consent doctrine was one of negligence. *Id.*, 80 Md.App. at 75–76, 559 A.2d 813. It said that while the jury determined that Miller did not give Schaefer sufficient information to make an independent and knowing decision to have the cataract operation, the breach of Miller's duty to inform did not vitiate the contractual relationship between the parties. *Id.* at 76, 559 A.2d 813. The lack of sufficient information, the court held, rendered the consent ineffective as a defense to negligence but did not change the contractual nature of the doctor-patient relationship. It concluded that Miller's tortious conduct arose out of the preexisting contractual relationship. In this regard, it determined that there was a sufficient nexus between Miller's negligent acts and the contractual relationship out of which they arose. *Id.* at 76,

---

**3.** In *Hoover*, we recognized that a physician may incur a tort obligation under nonconsensual circumstances and independent of contract if he "assumes to act, even though gratuitously." 236 Md. at 253, 203 A.2d 861.

559 A.2d 813. The tort in this case, it said, consisted of nothing more than an allegedly negligent performance of a contract obligation. It therefore said that in view of the contractual relationship between the parties, to recover punitive damages for the negligence committed required that Schaefer prove actual malice under *Testerman*, of which there was utterly no evidence. Thus, the court reversed the judgment for punitive damages.

## IV.

In her certiorari petition, Schaefer claimed that

"[t]he essence of plaintiff's case at trial was that 1) the defendant either negligently or fraudulently failed to obtain the plaintiff's informed consent in violation of fiduciary duties, 2) the defendant either negligently or fraudulently induced the plaintiff to have cataract surgery when it was not needed in violation of his fiduciary duties, 3) the defendant performed an intraocular lens implant without obtaining *any* consent, much less informed consent, also in violation of his fiduciary duties, and 4) the defendant was negligent in failing to recognize the plaintiff's postoperative infection earlier, failed to treat it immediately, performed a vitrectomy when it should have been performed by an expert and negligently performed laser treatments on the plaintiff's eye."

Upon this foundation, Schaefer presented two questions in her certiorari petition:

1.  Whether the verdict for punitive damages should be reinstated because the torts in this case did not arise out of a contractual relationship and therefore punitive damages may properly be obtained on a showing of implied malice.

2.  Whether implied malice is the proper standard in a contract action involving a breach of fiduciary duty.

In opposing Schaefer's petition, Miller protested that the torts of battery and fraud were never asserted at the trial. He said that "[t]here was never even a claim, let alone an issue of fraudulent inducement or battery"; rather, the

plaintiff's pleadings alleged only negligence, as the Court of Special Appeals held. The only liability issues, according to Miller's answer, were informed consent, preoperative and postoperative negligence, and causation. He maintained that because Schaefer alleged only negligence, the case was tried on that theory and was submitted to the jury only on those issues, and only pursuant to jury instructions pertinent to those issues.

## V.

Before us, Schaefer argues that *Testerman* and its progeny establish artificial distinctions between actual and implied malice that complicate the objectives of punitive damages. While she does not argue for a direct overruling of *Testerman*, she urges that we create an exception to the *Testerman* rule, establishing implied rather than actual malice as the standard for the recovery of punitive damages in contract actions involving a breach of fiduciary duty. Schaefer further asserts that there was fraud in the inducement of the contract in this case, which breached the doctor-patient fiduciary relationship and thus voided the contractual relationship. She claims that it was not necessary that she specially pled fraud and battery to recover punitive damages because Miller, through his wanton and egregious behavior, overstepped the line which divides negligence from fraud in a medical malpractice case. In this regard, she says that the allegations of her complaint are not essentially contractual in nature, but rather relate to tortious conduct evidencing a breach of fiduciary duty, and thus implied malice is the approved standard for an award of punitive damages. During oral argument, Schaefer candidly admitted that she consciously declined to allege breach of a fiduciary duty as a separate count for several reasons, one of which was to avoid the risk of denial of insurance coverage under Miller's malpractice policy.

We agree with the Court of Special Appeals that a contractual relationship existed between Miller and Schae-

fer and that it was not vitiated by Miller's tortious conduct. We also agree with that court that Schaefer's failure to allege the independent torts of breach of a fiduciary duty and battery foreclose her from seeking an exception to the *Testerman* rule in contract actions involving a breach of fiduciary duty.

■ On the record before us, we conclude that the negligence in this case arose out of a contractual relationship which preexisted the tortious conduct; and that the negligence "found its source in the contract without which the wrong would not have been committed." *See Wedeman v. City Chevrolet Co., supra,* 278 Md. at 529, 366 A.2d 7. And, as we later said in *General Motors Corp. v. Piskor,* 281 Md. 627, 640, 381 A.2d 16 (1977), in refining the requirements for torts arising out of contracts, there must "be a direct nexus between the tortious act and performance or breach of the terms and conditions of the parties' underlying contract." In that case, we recognized that the common thread in such cases was that "the tortious conduct and the contract were so intertwined that one could not be viewed in isolation from the other.... [In some cases], the tort consisted of nothing more than an allegedly negligent performance of contract obligations.... In one form or another, then, the tort arose directly from performance or breach of the contract." *Id.* at 637, 381 A.2d 16.

It may be, as Chief Judge Gilbert said in his concurring opinion in this case, 80 Md.App. at 78, 559 A.2d 813, that no other jurisdiction has adopted the reasoning of *Testerman.* This reflects in part the wide diversity of reasons utilized across the country governing the award of punitive damages. For example, some states refuse to recognize punitive damages; others prohibit such damages unless expressly authorized by statute; still others limit punitive damages to costs of litigation. By statute in two states, punitive damages have been abolished against certain health care providers. *See* Ill.Ann.Stat. ch. 110, para. 2–1115 (Smith–Hurd 1983, 1989 Cum.Supp.); Or.Rev.Stat. § 18.550(1) (1989). Medical malpractice cases in some states differenti-

ate between malfeasance, misfeasance and nonfeasance in punitive damage awards. *See* 2 Ghiardi & Kircher, *Punitive Damages Law and Practice,* §§ 17.04–17.07 (1985, 1989 Cum.Supp.). Other states have established other rules governing punitive damage awards, which, we think, reflect our determination in *Testerman* to formulate a workable standard for the award of punitive damages in various kinds of causes of action. As we said in *General Motors Corp., supra* 281 Md. at 639, 381 A.2d 16:

> "Recognizing that torts arising out of contractual relationships exhibit characteristics of both tort and contract actions, we sought in *Testerman* to fashion a workable rule governing the recovery of punitive damages which would be more stringent than that applied in pure tort cases, but which at the same time would allow the possibility of recovery where the particular conduct clearly warranted the imposition of such damages."

Finally, we allude again to *Miller Building Supply v. Rosen, supra,* a case in which an employer sued two of its former salesmen for fraud, civil conspiracy, and breach of fiduciary duty. There, the employer's claims arose from the employment contracts between the employer and its former employees. 305 Md. at 348–49, 503 A.2d 1344. In that case, "[w]e decline[d] [the employer's] invitation to create a fraud exception to the *Testerman* rule." *Id.* at 355, 503 A.2d 1344.

We thus conclude that the award of punitive damages in this case was contrary to our holding in *Testerman* and was therefore properly reversed.

JUDGMENT AFFIRMED, WITH COSTS.

RODOWSKY and McAULIFFE, JJ., concur.

ELDRIDGE, J., concurs in the judgment with an opinion in which CHASANOW, J., and COLE, J. (Retired) join.

**312**

ELDRIDGE, Judge, concurring:

I concur in the result reached in this case; however, I do not concur in Chief Judge Murphy's opinion announcing the judgment. Specifically, I disagree with Chief Judge Murphy's adherence to the *Testerman–Wedeman* standard governing awards of punitive damages in tort cases where actual malice is not proven. The standard, which originated in *H & R Block, Inc. v. Testerman*, 275 Md. 36, 338 A.2d 48 (1975), and was refined in *Wedeman v. City Chevrolet Co.*, 278 Md. 524, 366 A.2d 7 (1976), purports to distinguish between torts arising out of contractual relationships and torts not so arising. In the former situation punitive damages based on implied malice are not allowed, but in the latter situation punitive damages are recoverable even though there is no actual malice.

The *Testerman–Wedeman* rule was not supported by the Maryland cases relied upon in the *Testerman* and *Wedeman* opinions and is not supported by the decisions in any other jurisdiction. The rule has utterly no relationship to the purposes of punitive damages, leads to irrational results, and has been arbitrarily and inconsistently applied.

With respect to the allowance of punitive damages in tort actions grounded upon negligence, I would return to one of the two rules which had prevailed in Maryland before the adoption of the *Testerman–Wedeman* standard in 1975–1976. Prior to 1972, in the absence of statute, punitive damages were not recoverable in negligence actions unless there was actual malice or similar wrongful motive. *Davis v. Gordon*, 183 Md. 129, 133–134, 36 A.2d 699, 700–701, 156 A.L.R. 1109 (1944). In *Smith v. Gray Concrete Pipe Co.*, 267 Md. 149, 297 A.2d 721 (1972), this Court, relying entirely upon out-of-state authority, departed from settled Maryland law in this regard. *Smith* was an action based on the negligent operation of a motor vehicle and negligent entrustment, and the Court authorized the recovery of punitive damages on an "implied malice" basis where the plaintiff both pled and proved facts showing "a 'wanton or reckless disregard for human life,'" and "conduct which is

of an extraordinary or outrageous character." 267 Md. at 168, 297 A.2d at 731.

In the case at bar, the plaintiff is not entitled to punitive damages under either the standard of *Smith v. Gray Concrete Pipe Co., supra,* or the pre-*Smith* rule.

## I.

## A.

*H & R Block, Inc. v. Testerman, supra,* was *inter alia,* a tort action based upon the defendant's negligence in connection with the preparation of the plaintiffs' income tax returns. The plaintiffs sought both compensatory and punitive damages, but the trial court dismissed the claim for punitive damages. The trial court seemed to indicate that, in a negligence action, punitive damages were recoverable where there was implied malice consisting of "extraordinary or outrageous behavior ... or wanton conduct," but the court held that the defendant's actions, although negligent, did not meet this standard.[1] The Court of Special Appeals, apparently agreeing with the trial court as to the legal standard, and relying on *Smith v. Gray Concrete Pipe Co., supra,* 267 Md. 149, 297 A.2d 721, held that punitive damages were recoverable in a negligence action where the tortious conduct was accompanied either by actual malice "or by a reckless disregard of the rights of others...." *Testerman v. H & R Block, Inc.,* 22 Md.App. 320, 349, 324 A.2d 145, 160–161 (1974). The intermediate appellate court, however, disagreed with the trial judge as to whether the evidence was sufficient to meet the implied malice standard. The Court of Special Appeals held that the evidence regarding the competence of H & R Block's tax preparers, and the manner in which the qualifications of the tax preparers were held out to the public, was decep-

---

1. Opinion of the trial court, quoted by the Court of Special Appeals in *Testerman v. H & R Block,* 22 Md.App. 320, 323–325, 324 A.2d 145, 147–148 (1974).

tive, was "in reckless disregard of the rights of others, and would support an award of punitive damages." *Testerman v. H & R Block, Inc., supra,* 22 Md.App. at 351, 324 A.2d at 161–162.

This Court in *Testerman* reversed the decision of the Court of Special Appeals. The Court's opinion agreed with the Court of Special Appeals that the gist of the tortious conduct was that "Block was demonstrably negligent in hiring inexperienced employees, and in holding them out to the public as qualified consultants...." *H & R Block, Inc. v. Testerman, supra,* 275 Md. at 47–48, 338 A.2d at 54. This Court did not disagree that such conduct amounted to a "reckless disregard of the rights of others." But, the Court held, the conduct "did not amount to actual malice." 275 Md. at 48, 338 A.2d at 54. Relying principally upon *Knickerbocker Co. v. Gardiner Co.,* 107 Md. 556, 69 A. 405 (1908), the Court formulated a rule that "in tort actions arising out of contractual relationships," punitive damages are recoverable only when "actual malice" is established. 275 Md. at 44, 338 A.2d at 53. With regard to the Court of Special Appeals' reliance upon the implied malice holding of *Smith v. Gray Concrete Pipe Co., supra,* this Court's *Testerman* opinion stated that the *Smith* holding was "confined to a wanton or reckless disregard for *human life,* and to the operation of a *motor vehicle.*" 275 Md. at 47, 338 A.2d at 54, emphasis in original. The Court concluded that H & R Block's tortious conduct

"arose out of a contractual relationship. Consequently, actual malice is a prerequisite to the recovery of punitive damages in this case.

"Plainly, there was no actual malice here." 275 Md. at 47, 338 A.2d at 54.

The *Testerman* opinion did not indicate what would be the standard for determining implied malice in a tort action *not* arising out of a contractual relationship.

The following year, in *Wedeman v. City Chevrolet, supra,* 278 Md. 524, 366 A.2d 7, this Court clarified and refined its *Testerman* holding. *Wedeman* was a fraud

action by an automobile purchaser against an automobile dealer based on the dealer's fraudulent misrepresentation that the car purchased had not previously been damaged. The plaintiff went to City Chevrolet to purchase a new car because she had previously dealt with City Chevrolet and the dealership "had been honest" with her. After selecting the car she wanted, which was being used as a demonstrator, she asked the salesman about its condition and was told that the vehicle had "never been involved in an accident or damaged in any way." Upon receiving this assurance, the plaintiff purchased the car. About one week later, the plaintiff learned that the car had previously been damaged; the dealer then acknowledged that it had been damaged in shipment from the manufacturer and that it had been repaired.

The plaintiff in *Wedeman* recovered both compensatory and punitive damages from the dealer, but the Court of Special Appeals reversed the award of punitive damages in light of *Testerman.* The intermediate appellate court reviewed the facts of *Testerman*, indicated that the tortious conduct of the automobile dealer similarly arose out of a contractual relationship, and that, therefore, punitive damages were not recoverable based on implied malice. *City Chevrolet v. Wedeman*, 30 Md.App. 637, 639–640, 643, 354 A.2d 185, 187, 189 (1976). The Court of Special Appeals further held that there was no evidence of actual malice, as the automobile dealer was motivated simply by "a desire to realize a commercial gain," 30 Md.App. at 643, 354 A.2d at 189.

This Court in *Wedeman* reversed the judgment of the Court of Special Appeals and reinstated the award of punitive damages, holding that the tort did not arise out of a contractual relationship and that, therefore, punitive damages could be based on implied malice. This Court held that a tort arises out of a contractual relationship within the meaning of *Testerman* only when "the contractual relationship preexisted the tortious conduct.... Thus, when one may be induced by fraud to enter into a contract, the tort in

that instance cannot be said to arise out of the contractual relationship. It is the tortious conduct which conversely induces the innocent party to enter into the contractual relationship." *Wedeman v. City Chevrolet Co., supra,* 278 Md. at 529–530, 366 A.2d at 11. This Court went on to hold that the appropriate standard for implied malice in the *Wedeman* case was whether the "conduct [was] of an extraordinary nature characterized by a wanton or reckless disregard for the rights of others." 278 Md. at 532, 366 A.2d at 13. Thus the Court in *Wedeman* adopted essentially the same standard for implied malice which it had adopted in *Smith v. Gray Concrete Pipe Co., supra,* and which the Court of Special Appeals had applied in *Testerman.*[2]

## B.

The "arising out of contractual relations" rule formulated in *Testerman* and *Wedeman* had no support in the Maryland cases relied on in the *Testerman* and *Wedeman* opinions.

As previously mentioned, the principal case relied upon in *Testerman* was *Knickerbocker Co. v. Gardiner Co., supra,* 107 Md. 556, 69 A. 405. *Knickerbocker,* and the other

---

2. Some earlier Maryland cases had indicated that the existence of fraud itself showed a sufficiently evil motive to support an award of punitive damages, and that no further showing was required. *See, e.g., Phil., Wilm. & Balt. Railroad Co. v. Hoeflich,* 62 Md. 300, 307 (1884) ("to entitle one to [punitive] damages there must be an element of *fraud,* or malice, or evil intent, or oppression entering into and forming part of the wrongful act," (emphasis added)); *McClung–Logan v. Thomas,* 226 Md. 136, 148, 172 A.2d 494, 500 (1961) ("malice, fraud, deceit [or] wrongful motive" is sufficient to support an award of punitive damages). *See also* J. McCadden, *Punitive Damages,* 6 U.Balt.L.Rev. 203, 209 (1977). Other cases had indicated that fraud itself was not sufficient and that the fraud must be accompanied by something more for punitive damages to be allowed. *See, e.g., Russell v. Stoops,* 106 Md. 138, 143–144, 66 A. 698, 700 (1907) ("such [punitive] damages may be allowed where the [fraud] involves some violation of duty springing from a relation of trust or confidence, or where the fraud is gross, or the case presents other extraordinary or exceptional circumstances clearly indicating malice and wilfulness").

Maryland cases relied on in *Testerman,* involved the tort of interference with contractual or business relations. With regard to *this specific tort,* it has long been the rule in Maryland, as well as in many other states, that actual malice is required in order for there to be an award of punitive damages.[3] These cases provide no support for the *Testerman–Wedeman* rule that distinguishes between tort actions based on wrongful conduct occurring prior to a contract between the parties and tort actions based on wrongful conduct occurring after a contract exists between the parties.[4] With respect to the tort of interference with business or contractual relations, there is no underlying contract between the tortfeasor and the plaintiff. Moreover, there may be no contract between the plaintiff and a third person at the time of the defendant's tortious conduct, as the tort covers wrongful interference with economic relationships where there is no contract. *See* the recent discussions of the tort and the Maryland cases in *K & K*

---

**3.** *See Daugherty v. Kessler,* 264 Md. 281, 284, 286 A.2d 95, 97 (1972); *Damazo v. Wahby,* 259 Md. 627, 638–639, 270 A.2d 814, 819 (1970); *Rinaldi v. Tana,* 252 Md. 544, 250 A.2d 533 (1969); *Knickerbocker Co. v. Gardiner Co.,* 107 Md. 556, 569–570, 69 A. 405, 410 (1908).

**4.** The only case cited in *Testerman* which contains language apparently supporting the *Testerman–Wedeman* rule is *St. Paul at Chase Corp. v. Manufacturers Life Ins. Co.,* 262 Md. 192, 278 A.2d 12, *cert. denied,* 404 U.S. 857, 92 S.Ct. 104, 30 L.Ed.2d 98 (1971). In that case the defendant breached a contract to obtain construction financing for plaintiff's apartment complex. The plaintiff sued for breach of contract and for negligent performance of the contract. In reversing the award of punitive damages, this Court recognized the general rule that punitive damages are unavailable in pure breach of contract actions. 262 Md. at 236, 278 A.2d at 33. Furthermore, the Court found that, based on prior Maryland decisions, punitive damages were unavailable in tort actions arising from contracts unless actual malice was shown. 262 Md. at 236–239, 278 A.2d at 33–35. In support of this statement, the Court relied on *Damazo v. Wahby, supra,* 259 Md. 627, 270 A.2d 814, and *Knickerbocker Co. v. Gardiner Co., supra,* 107 Md. 556, 69 A. 405, both of which involved the tort of wrongful interference with contractual relations. The Court in *St. Paul at Chase* misrelied on these cases to the same extent as did the Court in *Testerman.* The decision in *St. Paul at Chase,* however, was entirely correct in light of the then Maryland law that punitive damages were not allowable in negligence actions absent actual malice.

*Management v. Lee,* 316 Md. 137, 154–170, 557 A.2d 965, 973–981 (1989); *Sharrow v. State Farm Mutual,* 306 Md. 754, 763–765, 511 A.2d 492, 497–498 (1986); *Natural Design, Inc. v. Rouse Co.,* 302 Md. 47, 68–75, 485 A.2d 663, 673–677 (1984). The fact that the tort of interference with economic relations does not even require the existence of any particular contract underscores the incongruity of using cases involving that tort as authority for the *Testerman–Wedeman* rule.

The disallowance of punitive damages based on implied malice in tort actions for interference with economic relations has utterly nothing to do with whether the wrongful conduct preceded or followed a contract. Instead, the disallowance is grounded in the nature of the tort itself. Although interference with contractual or economic relationships is an intentional tort requiring wrongful conduct, actual malice in the sense of ill will towards the defendant is not a necessary ingredient.[5] As pointed out by this Court, in holding that punitive damages were not recoverable based on implied malice, usually the defendant's "object was merely to benefit itself." *Knickerbocker Co. v. Gardiner Co., supra,* 107 Md. at 569, 69 A. at 410. This rationale, which relates to the particular tort of interference with contract or economic relations, provides no justification for the *Testerman–Wedeman* rule differentiating wrongful conduct occurring prior to a contract from wrongful conduct occurring afterwards.

### C.

In addition to the lack of support in the cases relied on in the *Testerman* opinion, the *Testerman–Wedeman* rule was inconsistent with several previous decisions of this Court.

---

5. *See, e.g., K & K Management v. Lee,* 316 Md. 137, 155–164, 557 A.2d 965, 973–978 (1989); *Natural Design, Inc. v. Rouse,* 302 Md. 47, 71, 485 A.2d 663, 675 (1984), and cases there cited. *See also Baird v. C. & P. Tel. Co. of Baltimore,* 208 Md. 245, 260, 117 A.2d 873, 880 (1955) (tort requires "an intentional interference with contract rights of other parties," and a negligent interference is insufficient).

In numerous cases involving torts arising out of contractual relations, with the tortious conduct occurring after the contract, this Court had taken the position that punitive damages were recoverable on an implied malice basis. *See, e.g., Vancherie v. Siperly,* 243 Md. 366, 373–374, 221 A.2d 356, 360 (1966) (assault and battery by a business proprietor against a customer, arising out of a prior contractual relation, with the proprietor arguing that a punitive damage award was improper because of the absence of actual malice, and the Court responding that the proprietor's argument "overlooks the fact that a finding by the jury that the injury had been wantonly inflicted would also justify the award of exemplary damages"); *McClung–Logan v. Thomas,* 226 Md. 136, 148, 172 A.2d 494, 500 (1961) (counterclaim by conditional buyer of a chattel against the conditional seller for wrongful conversion of the chattel, with the Court affirming the award of punitive damages, saying that "[p]unitive damages are properly a question for the jury in an action for wrongful conversion of personal property where the act of the defendant is accompanied with ... [*inter alia*] recklessness, wantonness, oppressiveness, wilful disregard of the plaintiff's rights, or other circumstances, tending to aggravate the injury"); *Safeway Stores, Inc. v. Barrack,* 210 Md. 168, 176–177, 122 A.2d 457, 461–462 (1956) (false imprisonment and malicious prosecution action by a customer against a store, where the tortious conduct occurred after the contractual relationship, and this Court affirmed the award of punitive damages, saying that punitive damages were recoverable under the false imprisonment counts if the conduct was, *inter alia,* "wanton," and under the malicious prosecution counts based on the inference of malice from the lack of probable cause); *Dennis v. Baltimore Transit Co.,* 189 Md. 610, 616–617, 56 A.2d 813, 816–817 (1948) (false arrest action by a passenger against a common carrier; the Court stated that punitive damages were recoverable if the injury were "inflicted maliciously or wantonly" and " 'wanton' means characterized by extreme recklessness and utter disregard for the rights of others"); *Nichols v. Meyer,* 139 Md. 450,

457, 115 A. 786, 788 (1921) (action of trespass *de bonis asportatis,* where the trespass occurred after the beginning of the contractual relationship, and the Court stated that punitive damages were recoverable where the conduct was, *inter alia,* "reckless" or "wanton"); *McNamara v. Pabst,* 137 Md. 468, 473, 112 A. 812, 813 (1921) (malicious prosecution action based on conduct arising out of and occurring after the sale of a chattel from the plaintiff to the defendant); *Mertens v. Mueller,* 119 Md. 525, 534–535, 87 A. 501, 504–505 (1913), 122 Md. 313, 89 A. 613 (1914) (malicious prosecution action where the tortious conduct arose out of an employment contract between the parties); *Boyer & Co. v. Coxen,* 92 Md. 366, 371, 48 A. 161, 163 (1901) (assault and battery arising out of and occurring after a contract for the sale and delivery of goods, with the Court saying that if the defendant acted " 'wantonly and in a high-handed and outrageous manner' he is liable to exemplary damages"); *The Atlantic & c., Coal Co. v. The Maryland Coal Co.,* 62 Md. 135, 143–144 (1884); *Phila., Wil., & Balto. R.R. Co. v. Larkin,* 47 Md. 155, 163–164 (1877); *Balt. & Yorktown Turnpike v. Boone,* 45 Md. 344, 354–356 (1876).

On the other hand, there are many Maryland cases where there was no contractual relationship between the parties but where, because of the particular type of tort involved, the Court held that actual malice was required for an award of punitive damages. *See, e.g., Davis v. Gordon, supra,* 183 Md. at 133–134, 36 A.2d at 701 (punitive damages not recoverable in a negligence action even though the defendant's negligence was "gross and wanton," as no actual malice existed); *Heinze v. Murphy,* 180 Md. 423, 431–432, 24 A.2d 917, 921–922 (1942) (in a tort action based on an unlawful arrest by a law enforcement officer, punitive damages are recoverable only on a showing of actual malice); *Baltimore and Ohio R.R. Co. v. Boyd,* 63 Md. 325, 334–335 (1885) (in an action for trespass to land, actual malice in the sense of an "evil motive or intent" is required for an award of punitive damages).

Therefore, under Maryland tort cases from the earliest days until recently, the allowability of punitive damages

based upon implied malice depended upon the type of wrongful conduct involved and not upon the time when the wrongful conduct occurred in relation to a contract between the parties. For purposes of recovering punitive damages, there is no sound basis in the pre-*Testerman* Maryland tort cases for distinguishing tortious conduct occurring after a contract between the parties from all other tortious conduct. Moreover, there is no basis for the *Testerman–Wedeman* rule in any authority elsewhere. As Chief Judge Gilbert stated in his concurring opinion in this case in the Court of Special Appeals, "[i]nsofar as we have been able to determine, not one other State has chosen to adopt the reasoning of *Testerman* or its siblings." 80 Md.App. at 78, 559 A.2d at 821.

## D.

Moreover, the *Testerman–Wedeman* rule has no relation whatever to the purposes of punitive damages. This Court has pointed out that there are dual purposes in awarding punitive damages, namely " 'as punishment for outrageous conduct and to deter future transgressions.' " *Nast v. Lockett,* 312 Md. 343, 349, 539 A.2d 1113, 1116 (1988). *See, First Nat'l Bank v. Fid. & Dep. Co.,* 283 Md. 228, 232, 389 A.2d 359, 361 (1978) ("exemplary 'damages are awarded ... to punish the wrongdoer, to teach him not to repeat his wrongful conduct and to deter others from engaging in the same conduct' "). *See also* M. Treanor, *Punitive Damages,* 8 U.Balt.L.Rev. 222, 223 (1979). Consequently, the purposes of punitive damages relate entirely to the nature of the defendant's conduct. If that conduct is sufficiently bad, *i.e.,* malicious, so that punishment and deterrence by means of a tort judgment are appropriate, then punitive damages may be awarded.

The *Testerman–Wedeman* rule, however, instead of relating to the heinousness of the defendant's conduct, is tied to *when* that conduct occurs relative to a contract between the parties. Under the *Testerman–Wedeman* standard, in the absence of actual malice, if there is a contract between

the parties and if the wrongful conduct occurs after the contract, there can be no recovery of punitive damages no matter how outrageous, wanton, or reckless the defendant's conduct may be. On the other hand, if the identical outrageous, wanton, or reckless conduct occurs before the contract is entered, or where there is no contract, punitive damages may be recovered. This distinction is wholly arbitrary, and has nothing to do with the purposes of punitive damages.

Since the *Testerman–Wedeman* rule has no relation to the conduct which punitive damages are intended to punish or deter, application of the rule can lead to completely irrational results. For example, to vary the facts in the *Wedeman* case, let us assume that the automobile had not been damaged in shipment to the dealer but had been damaged to the same extent, and then repaired by the dealer, between the time the contract of sale was signed and the time of delivery. Furthermore, assume that, at the time of delivery, in response to the plaintiff's question, and to induce the plaintiff to accept delivery, the salesman had reiterated to the plaintiff that the car had "never been ... damaged in any way." Under this scenario, because the fraudulent conduct would have occurred after the contract, the result in the case would have been different from the result in *Wedeman*, and punitive damages would not have been allowed.[6] Nevertheless, the defendant's conduct would have been essentially the same, would have been equally outrageous, and should be equally punishable.

## E.

Finally, the *Testerman–Wedeman* rule has been arbitrarily and inconsistently applied by this Court. The initial

---

6. *See Miller Building Supply v. Rosen,* 305 Md. 341, 352–355, 503 A.2d 1344, 1350–1351 (1986). For an example of a case involving particularly outrageous fraud by the tortfeasor for which an award of punitive damages was refused under the *Testerman–Wedeman* standard, *see Aeropesca Ltd. v. Butler Aviation International,* 44 Md.App. 610, 411 A.2d 1055 (1980).

inconsistency was between the two cases formulating the rule, namely the *Testerman* and *Wedeman* decisions themselves. As previously discussed, in *Testerman* the wrongful conduct which was deemed particularly outrageous, deceptive, and in reckless disregard of the rights of others, and which was the basis for the implied malice, concerned the competence of the defendant's tax preparers, the defendant's advertising, and the manner in which the qualifications of the tax preparers were held out to the public. *See Testerman v. H & R Block, Inc., supra,* 22 Md.App. at 351, 324 A.2d at 161–162; *H & R Block, Inc. v. Testerman, supra,* 275 Md. at 47–48, 338 A.2d at 54 ("Although Block was demonstrably negligent in hiring inexperienced employees, and in holding them out to the public as qualified consultants, this did not amount to actual malice"). Thus, the tortious conduct, constituting the implied malice and the grounds for punitive damages, preceded the contract between the plaintiffs and the defendant. It induced the plaintiffs to enter a contractual relationship with the defendant. Consequently, when *City Chevrolet v. Wedeman, supra,* 30 Md.App. at 639–640, 643, 354 A.2d at 187–189, reached the Court of Special Appeals, that court understandably held that the similarly deceptive wrongful conduct by the defendant, which induced the plaintiff to enter a contractual relationship, likewise arose out of a contractual relationship and could not support an award of punitive damages on an implied malice basis.

This Court's *Wedeman* opinion, however, totally ignored the facts in *Testerman* on which the punitive damage claim was based. We simply included *Testerman* with a string of citations to cases involving breach of contract and tortious interference with contract, and erroneously stated that "[t]hose cases ... had in common one salient fact: the contractual relationship preexisted the tortious conduct." *Wedeman v. City Chevrolet Co., supra,* 278 Md. at 529, 366 A.2d at 11. Since in *Wedeman* the tortious conduct giving rise to the punitive damage claim preceded the contract and induced it, this Court held that the conduct did not arise out

of a contractual relation and that punitive damages based on implied malice were recoverable. On their facts, the *Testerman* and *Wedeman* decisions represent totally contradictory applications of the rule formulated by those cases.

Another instance of the arbitrary and inconsistent application of the *Testerman–Wedeman* rule is *General Motors Corp. v. Piskor*, 281 Md. 627, 381 A.2d 16 (1977). *Piskor* involved an action by an employee against his employer for damages based on, *inter alia,* assault and false imprisonment. The case arose from an incident in which the employee Piskor was detained by security guards at the General Motors plant where he worked after management suspected that he was attempting to steal company property by concealing it in his jacket. Piskor recovered both compensatory and punitive damages, and this Court issued a writ of certiorari in order to decide whether the trial judge was correct in instructing the jury that it could base an award of punitive damages on a finding of either actual or implied malice. General Motors argued that because the torts arose out of a contractual relationship, namely the pre-existing employment contract, Piskor was required under the *Testerman–Wedeman* rule to prove actual malice. The plant rules gave the security guards the right to police company property and inspect all packages brought into or taken out of the plant, and the defendant argued that the rules authorized its conduct. This Court assumed that the plant rules were "embraced within the employment contract," although the Court declined to agree with the defendant's interpretation of its authority under the rules, 281 Md. at 635, 381 A.2d at 20. The Court went on to say, however, that the decisive question was not whether the defendant had exceeded its rights under the employment contract, as the jury had already held that the defendant's conduct was wrongful, but whether the defendant's conduct arose out of the contractual relationship.

The Court in *Piskor* then held that the defendant's conduct did not arise out of the contractual relationship. The

Court seemed to offer two reasons for this conclusion. First, the Court stated that, while in *Testerman* and its progeny the tortious conduct and the contract were "intertwined," in *Piskor* the defendant's conduct "bore, at most, a collateral relationship to the employment contract—at least in regard to performance or breach of its conditions." *General Motors Corp. v. Piskor, supra,* 281 Md. at 637, 639, 381 A.2d at 21, 23. The Court said that for a tort to arise out of a contractual relationship, there must "be a direct nexus between the tortious act and performance or breach of the terms and conditions of the parties' underlying contract," and that "no such nexus existed here." 281 Md. at 640, 381 A.2d at 23. Second, the *Piskor* Court distinguished *Testerman* on the ground that "[h]ere, we deal with torts in the purest sense of that term—false imprisonment and assault." 281 Md. at 639, 381 A.2d at 23.

It is difficult to understand why the critical tortious conduct in *Testerman* had a greater nexus with a contract than the tortious conduct in *Piskor.* If an employee, while on the job, is stealing his employer's property, it would seem to constitute a breach of his obligations under the employment contract. An employer's attempt to determine whether an employee was stealing company property while at work would appear to be directly related to the employment contract. As to the second reason in *Piskor* for distinguishing *Testerman,* the determination of which torts are "pure" seems to present insurmountable problems. The opinion does not define "pure." [7] If a "pure" tort is one having no relationship to a contract, the notion becomes meaningless. Virtually any tort can, depending upon the circumstances, arise out of and be intertwined with a contractual relationship. On the other hand, almost any tort may be committed where there is no contractual relationship. The *Piskor* decision simply cannot be reconciled with the earlier *Testerman* and *Wedeman* opinions.

---

7. Thus we are given no clue as to why assault and false imprisonment are "pure" but fraud, conversion, and negligence are not.

Still another example of a case in which punitive damages would appear to have been precluded under the *Testerman–Wedeman* rule, but where they were allowed, is *Henderson v. Maryland Nat'l Bank*, 278 Md. 514, 366 A.2d 1 (1976). In *Henderson*, the plaintiff had purchased an automobile under a conditional sales contract which was assigned to the bank. Because, according to the bank's erroneous records, the plaintiff had not made a payment on the car, and because the plaintiff had refused to bring to the bank his records which would have shown that he had made the payment, the bank repossessed the vehicle. It is clear from the facts in *Henderson* that the bank was extremely negligent in keeping its records and acted in a reckless and high-handed manner. Its conduct was sufficiently outrageous, reckless, and wanton to constitute implied malice. Nevertheless, there was no evidence that any bank employee personally harbored ill-will towards the plaintiff or was motivated by anything other than a desire to collect the money which the bank's erroneous records showed was due. When, later on the same day the car was repossessed, the plaintiff's attorney showed to the bank's employees the cancelled checks which demonstrated that there was no delinquency, the automobile was released.

The plaintiff in *Henderson* brought an action for conversion, recovering both compensatory and punitive damages. The Court of Special Appeals reversed the award of punitive damages on the ground that there was no evidence of actual malice and that, under *Testerman*, punitive damages could not be recovered based on implied malice. This Court, however, reinstated the award of punitive damages, holding that the evidence of the bank's conduct, particularly the insistence that the plaintiff bring his records to the bank, "permitted a reasonable and probable *inference* that the bank employee was motivated by actual malice," *Henderson v. Maryland Nat'l Bank, supra*, 278 Md. at 522–523, 366 A.2d at 5–6, emphasis added. Actual malice, being a state of mind, can obviously be inferred from other facts, such as statements or actions which clearly indicate

ill will. *See, e.g., Sawyer v. Humphries,* 322 Md. 247, 261, 587 A.2d 467, 474 (1991) (actual malice inferred from unprovoked assaults, battery, and threat to kill). In *Henderson,* however, the conduct from which actual malice was inferred was simply wanton or reckless conduct of a type which has usually been viewed as a basis for implied malice only.

With regard to punitive damages in tort cases where a contract exists, this Court, beginning with its *Testerman* opinion, has seemed to create new rules on a case by case basis in order to achieve the result desired in each particular case. These "rules" have little or no foundation in pre-*Testerman* Maryland law and lead to inconsistent results. I would totally abandon the *Testerman–Wedeman* standard and return to the principles relating to punitive damages which had prevailed in this State for many, many years before *Testerman.*[8]

## II.

The case before us is a negligence action and should be governed by the principles applicable to such actions. As indicated earlier, prior to 1972, in the absence of statute, punitive damages were not recoverable in negligence actions absent actual malice or similar wrongful motive. They were not recoverable on an implied malice basis no matter how gross, reckless, or wanton the defendant's conduct might be.

The leading case is *Davis v. Gordon, supra,* 183 Md. 129, 36 A.2d 699. *Davis* grew out of a hit-and-run automobile accident in which the defendant, driving his car at night,

---

**8.** I am well-aware that I joined all of the opinions of this Court which I criticize today. *See,* however, *McGrath v. Kristensen,* 340 U.S. 162, 178, 71 S.Ct. 224, 233, 95 L.Ed. 173, 185 (1950) (Jackson, J., concurring), where Justice Jackson quoted Baron Bramwell that " 'The matter does not appear to me now as it appears to have appeared to me then.' " *See also Brandywine–Main Line Radio, Inc. v. F.C.C.,* 473 F.2d 16, 80 (D.C.Cir.1972) (Bazelon, C.J., dissenting), *cert. denied,* 412 U.S. 922, 93 S.Ct. 2731, 37 L.Ed.2d 149 (1973).

struck two pedestrians who were walking on the dirt shoulder adjacent to the paved roadway. Upon striking the pedestrians, the defendant and the passenger in his car "knew we had hit them; so we did not go back, but I [the defendant] took Mrs. Dea [the passenger] home and then went home and went to bed." 183 Md. at 131, 36 A.2d at 700. One of the pedestrians died and one was injured. At the trial, the judge instructed the jury that it could award punitive damages if the defendant's negligence was gross and wanton, and the jury awarded punitive as well as compensatory damages. This Court, however, reversed the award of punitive damages. As to the plaintiff's argument "that the negligence of defendant was so gross and wanton as to justify ... an instruction" on punitive damages, this Court replied: "In this State, that is not the test." 183 Md. at 133, 36 A.2d at 701. The Court held that " 'in such cases as these,' " there must be an " 'evil motive or intent' " to support an award of punitive damages. *Ibid.* The Court also rejected the plaintiff's argument that the defendant's failure to stop, in violation of a criminal statute, showed a state of mind warranting punitive damages. 183 Md. at 133–134, 36 A.2d at 701. The Court indicated that, with respect to the negligent operation of motor vehicles, the criminal penalties for violations of the motor vehicle laws constituted a better deterrent than punitive damages, saying (183 Md. at 133, 36 A.2d at 701):

> "We have many rules of the road, all designed and intended to promote the public safety. They have severe penalties for their violation whether there is an accident or not. If all drivers and all pedestrians observed these rules there would not be any accidents. The rules of the road are far more effective than any inflammatory verdicts in making our streets and highways safe for travel. The fear of arrest is more of a deterrent than a verdict in a civil case for damages."

The 1972 decision in *Smith v. Gray Concrete Pipe Co.,* *supra,* 267 Md. 149, 297 A.2d 721, was the first time this Court authorized punitive damages in a negligence action

on an implied malice basis. Like *Davis v. Gordon, Smith* was a negligence action arising from a motor vehicle collision. The case reached this Court by a certified question from the United States District Court for the Eastern District of Virginia. The punitive damage issue was presented by two counts in the complaint, one charging negligent entrustment and the other charging negligent operation of a motor vehicle. This Court, relying upon 61A C.J.S. *Motor Vehicles* § 560; 22 Am.Jur.2d *Damages* § 244; and cases in other jurisdictions, decided that punitive damages are recoverable on an implied malice basis in actions involving the negligent entrustment of and the negligent operation of motor vehicles. 267 Md. at 162–165, 168, 297 A.2d at 729–731. The Court adopted the standard for implied malice from the manslaughter by motor vehicle statute, which requires proof of "gross negligence," defined as a "wanton or reckless disregard for human life." 267 Md. at 167, 297 A.2d at 731.

The *Smith* opinion emphasized that the implied malice standard there adopted stops "just short of wilful or intentional injury" and "contemplates conduct which is of an extraordinary or outrageous character." 267 Md. at 168, 297 A.2d at 731. *See Nast v. Lockett, supra,* 312 Md. at 350–351, 539 A.2d at 1116–1117. The *Smith* Court also stressed that the plaintiff must plead, as well as prove, *facts* meeting this stringent standard in order to have his claim for punitive damages entertained by the trial court. The *Smith* opinion thus stated: "No bald or conclusory allegations of 'wanton or reckless disregard for human life,' or language of similar import, shall withstand attack on grounds of insufficiency." 267 Md. at 168, 297 A.2d at 732. *See also Foor v. Juvenile Services,* 78 Md.App. 151, 170, 552 A.2d 947, 956, *cert. denied,* 316 Md. 364, 558 A.2d 1206 (1989).

It is somewhat unclear whether the *Smith* holding, concerning the recovery of punitive damages in a negligence action based on implied malice, applies only to actions involving the negligent entrustment and/or operation of

motor vehicles, or applies to other types of negligence actions. As earlier indicated, *H & R Block, Inc. v. Testerman, supra,* 275 Md. at 47, 338 A.2d at 54, stated that the *Smith* holding is limited "to the operation of a motor vehicle." In *Liscombe v. Potomac Edison Co.,* 303 Md. 619, 637, 495 A.2d 838, 847 (1985), we "assume[d] ... without deciding" that the *Smith* holding was applicable to other types of negligence actions. *See also Thorne v. Contee,* 80 Md.App. 481, 488–489, 565 A.2d 102, 105 (1989), *cert. denied,* 318 Md. 514, 569 A.2d 643 (1990); *Potomac Electric v. Smith,* 79 Md.App. 591, 616, 558 A.2d 768, 781, *cert. denied,* 317 Md. 393, 564 A.2d 407 (1989); *Boucher v. Riner,* 68 Md.App. 539, 547–548, 514 A.2d 485, 489–490 (1986); *Medina v. Meilhammer,* 62 Md.App. 239, 248–249, 489 A.2d 35, 39–40, *cert. denied,* 303 Md. 683, 496 A.2d 683 (1985); *Cohen v. Rubin,* 55 Md.App. 83, 96, 460 A.2d 1046, 1053 (1983); *American Laundry Mach. v. Horan,* 45 Md. App. 97, 111–112, 412 A.2d 407, 416–417 (1980). Presumably, if the *Smith* holding is limited to actions involving motor vehicles, the recovery of punitive damages in all other negligence actions, in the absence of statute, is controlled by the holding in *Davis v. Gordon, supra,* requiring a showing of actual malice.

### III.

In the present case, either under *Davis v. Gordon, supra,* or *Smith v. Gray Concrete Pipe Co., supra,* a reversal of the award for punitive damages would be required. Clearly there was no showing of actual malice in this case. Therefore, under *Davis v. Gordon,* punitive damages would not be recoverable.

Moreover, there should be no recovery of punitive damages here under the stringent implied malice standard set forth in the *Smith* case. The plaintiff's proof at trial was insufficient to demonstrate the requisite wanton and reckless conduct to justify punitive damages under the *Smith* test. The conduct causing plaintiff's injury demonstrates only simple negligence by the defendant. The failure to

provide informed consent about the cataract operation and the failure to obtain any consent for the lens implant do not indicate gross negligence or wanton disregard for the plaintiff's life or health. The procedure was not medically contraindicated.[9] Furthermore, there was no evidence that Dr. Miller failed to perform the cataract removal and intraocular lens implantation correctly. There was some suggestion that Dr. Miller's failure to examine the patient within 24 hours of the operation for signs of infection was negligent. Nevertheless, there was no indication that the infection which resulted post-operatively in any way was the result of negligence on the part of Dr. Miller.

The plaintiff's attorney argued extensively to the jury that an award of punitive damages was justified based on the evidence that Dr. Miller had forged Ms. Schaefer's signature to the informed consent form and had rewritten some of her medical records. Although this conduct is wanton and outrageous, and would meet the *Smith* standard in a different context, it occurred subsequent to the injury to Ms. Schaefer and did not cause or contribute to it. Thus, there was no implied malice involved in Dr. Miller's negligence in failing to obtain informed consent and in his post-operative care. This negligence action is not the proper vehicle for punishing Dr. Miller for his later conduct. Rather, the Commission on Medical Discipline is the appropriate body to address such matters.

## IV.

In recent years there has been a proliferation of claims for punitive damages in tort cases, and particularly in negligence cases. Studies have indicated that punitive damage awards have increased greatly in frequency and in amount. *See, e.g.,* M. Peterson, S. Sarma, M. Shanley, *Punitive Damages* (Rand, The Institute for Civil Justice,

---

9. There was evidence presented at trial that at the time of Ms. Schaefer's operation, approximately 90–95% of all cataract patients underwent such an operation.

1987). The Supreme Court has just "note[d] once again our concern about punitive damages that 'run wild.' " *Pacific Mutual Life Ins. Co. v. Haslip,* —— U.S. ——, 111 S.Ct. 1032, 1043, 113 L.Ed.2d 1 (1991). This trend represents a distortion of the traditional purpose of civil tort law, which is to compensate victims who are injured. Punishment should generally be left to the criminal law and administrative tribunals. *Davis v. Gordon, supra,* 183 Md. at 133, 36 A.2d at 701. While punishment, in the form of punitive damages in tort cases, may be appropriate where the defendant has acted with an evil motive, very few negligence cases involve such conduct. A return to the principles of *Davis v. Gordon* would greatly reduce the quantity of unjustified punitive damage claims in negligence actions.

The adoption and application of the *Testerman–Wedeman* rule, however, have greatly compounded the problem of routine punitive damage claims and awards in civil actions. In light of the case-by-case inconsistency and confusion inherent in this Court's opinions on punitive damages over the last twenty years, it is understandable that a lawyer would include a claim for punitive damages in almost any tort case. Perhaps the next shift by this Court, or the next new rule or variation adopted, will benefit the plaintiff in that particular case.

The most appropriate action which this Court could take, with regard to the unwarranted claims for and awards of punitive damages, would be to overrule *H & R Block, Inc. v. Testerman, supra,* and its progeny.

Judges COLE and CHASANOW have authorized me to state that they concur with the views expressed herein.